**STARTEX DRILLING COMPANY, INC.,**
Plaintiff-Appellee,

v.

**SOHIO PETROLEUM COMPANY,**
Defendant-Appellant.

No. 81–1416.

United States Court of Appeals,
Fifth Circuit.

July 16, 1982.

Rehearing Denied Aug. 24, 1982.

W. B. Browder, Jr., Andrew L. Kerr, Midland, Tex., Richard F. Remmers, Oklahoma City, Okl., for defendant-appellant.

Rassman, Gunter & Boldrick, James P. Boldrick, Midland, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, POLITZ and RANDALL, Circuit Judges.

CLARK, Chief Judge:

This contract dispute was filed under this court's diversity jurisdiction by an independent drilling contractor, Startex Drilling Company (Startex) against an operator of oil wells, Sohio Petroleum Company (Sohio). Based on the jury's answers to special interrogatories, the district court entered judgment for Startex. We affirm.

Startex agreed to drill two wells for Sohio in Midland County, Texas, in an area known as the Sprayberry Trend. Startex submitted a standard drilling contract to Sohio, which Sohio declined. Instead, Sohio sent back to Startex an API (American Petroleum Institute) Master Rotary Drilling Contract as modified by the Sohio Company. Startex's president, R. Frank Swinehart, executed the contract. Thereafter he executed the more particularized API Bid Sheet and Drilling Order. This describes the name and location of the wells to be drilled, the commencement date, and the specifications for drilling each well. Among these specifications are the subject well's proposed depth (8800 ft.), casing, mud program and rate of compensation.

What occurred in the drilling of this well is essentially undisputed. Rather, it is the meaning and legal effect of those events as defined by the contract which sparks the differences here. Therefore, before detailing the facts concerning the actual drilling operation, it is appropriate to outline the parties' differences with regard to the meaning of certain technical contractual terms.

The drilling order provides that Startex will be paid for drilling these wells (the Ernest Braden No. 1 and the David Braden No. 1) either at a rate of $17.58 per linear foot drilled, or at a rate of $4,750.00 per day. The provisions of the master contract control whether the footage or day rate is collected. The contract anticipates that the driller will, under normal conditions, be paid on a footage basis. The day rate will be collected only under certain circumstances. This dispute centers almost entirely on paragraph 8.6 of the contract, which pertains to one of those circumstances—loss of circulation. This paragraph recites:

8.6: If loss of circulation occurs while normal drilling operations are in progress on a footage rate basis, Contractor [Startex] shall notify Operator [Sohio] of such loss and shall use all reasonable means to restore the same, without compensation for the first eight hours after the loss. If Operator concurs that such conditions exist, operations to restore circulation after said eight hour period shall be performed on a day work basis until normal circulation is restored; provided, however, that Operator shall not be responsible for any fishing job or sticking of drill pipe, or other difficulty, which occurs during or prior to the said eight hour period and Contractor shall bear all expenses in connection therewith without compensation until said difficulty is overcome.

The parties agree that circulation in its most general meaning refers to that feature of drilling an oil well, whereby some type of drilling fluid or mud is pumped down the drill pipe. This is done to lubricate the drill bit, and to remove the earthen cuttings from the hole as the fluid recirculates to the surface. It also provides weight to the drilling column thus decreasing the danger of a gas pressure "blow out". Another term used by the parties to describe circulation is "returns," i.e., the return of the drilling fluid to the surface.

Occasionally, because of gaps or porosity in the formation, some or all of the drilling fluid will escape from the drilling column rather than returning to the surface. The parties agree that the term "loss of circulation" certainly applies in describing a situation where *none* of the drilling fluid returns to the surface. On the other hand, they also agree that the definition of the term "normal circulation" encompasses the situation where 100% of the regular, scheduled drilling fluid comes back. Their dispute arises in applying the terms loss of circulation and normal circulation, when the contractor is experiencing partial returns (as, for example, when only 80% of the drilling fluid returns) and is forced to use a special mud program not contemplated by the drill-

ing order. Under the contract the immediate consequence of applying these terms to the partial return situation is, of course, to determine whether the contractor experiencing partial returns should be paid by the foot or by the day. But, as the last clause in paragraph 8.6 makes clear, an additional consequence of defining these terms is that of determining who, as between the contractor and operator, will bear any ensuing expense such as that which arises if the drill pipe becomes stuck or breaks during this period of abnormal operation. Under paragraph 8.6, the operator bears the expense of overcoming a stuck pipe only if the pipe becomes stuck *after* an eight hour period of loss of circulation.

With this basic framework of the pertinent contractual terms in mind, we turn to the facts. Startex completed the first of the two wells in the drilling order, the Ernest Braden No. 1 well. It then moved its rig to the site of the David Braden No. 1 well. Because of problems it experienced with partial returns on the first well, Startex employees suggested that additional casing be set. (Casing is piping or cement which lines the outside of the hole through which the drill pipe turns. Obviously, this lining keeps drilling fluid from escaping into the formation.) Sohio declined this additional expense.

On July 15, 1981, Startex began drilling operations on the David Braden No. 1 well. Drilling proceeded normally on a footage basis until July 25, at 6:30 p. m. At that time the tour reports reflected no returns.[1] Both parties agree this event produced a loss of circulation. This loss of circulation continued through 2:30 a. m. July 26, or in other words, the requisite eight hours under paragraph 8.6. Therefore a representative of Sohio, Lee Crawford, came out to the rig

and took over its control. Normal circulation was restored, in Crawford's opinion, some four or five hours later, and so he left the rig.

Startex continued drilling with returns of as much as 80% until July 29th, when the drill pipe stuck. At approximately 1 a. m. that morning, Swinehart, the president of Startex, called J. H. Walters, the District Superintendent for Sohio, to notify him that the pipe was stuck. Swinehart told Walters that in his opinion Startex would be on day rate during the ensuing fishing job.[2] During this middle-of-the-night phone call, Sohio's Walters disagreed that Startex would be on day work. Swinehart replied that he would make sure about his analysis of the situation in the morning. Swinehart discussed the situation once more with his people that morning. He reaffirmed his position to Walters that Startex was on day work. Walters again rejected it.

Swinehart testified that he believed he had reached an impasse with Sohio in his efforts to have them bear the expense of the fishing job. He concluded that if he didn't arrange to fish the pipe, his rig would be idled indefinitely. Accordingly, without further notification to, or consent of Sohio, Swinehart ordered in third parties to perform the fishing job. The fishing job lasted until August 28, nearly a month. The cost was $142,630.00. After it was completed Startex resumed drilling with partial returns for a few days. On September 3, Sohio took over the well due to lost circulation. Sohio remained in control until the well's completion on September 12.

Startex billed Sohio on a footage basis for the progress made from July 15 until circulation was lost on July 25 at 6:30 p. m. It

1. Tour or "tower" reports were compiled on a continuous basis, in this case by Startex's driller, tool pusher, or drilling superintendent. The reports indicate information about the progress of the operation, most notably depths drilled, and "returns." The drilling fluid is contained in pits adjacent to the rig. The amount of fluid returning is calculated by observing the fluid level in the pits. The percentage of returns is estimated on the basis of this observation. The

testimony at trial established that Sohio received these tour reports soon after they were completed, and that the reports sufficed as the mode of notification of loss of circulation by the contractor to the operator.

2. A fishing job is exactly that—fishing the stuck pipe out of the hole. It can be a difficult, time-consuming, and expensive procedure.

billed on a day work basis from July 26 at 2:30 a. m. until the completion of the job. Thereafter, Startex submitted a bill seeking reimbursement for the third party services.

The portion of the charges disputed by Sohio is the billing on a day work basis after July 26 at approximately 7:30 a. m. That is the time at which Sohio maintains normal circulation was regained. Concomitantly, Sohio has refused to bear the expense of the third party charges for fishing the drill pipe. Sohio maintains that the pipe got stuck after normal circulation had been restored.

Unable to settle their differences, the parties came to court. The trial judge found the contract ambiguous in its pertinent parts. He therefore submitted the case to the jury to determine what the parties meant by loss of circulation and normal circulation, and to determine precisely when these events occurred. In answer to special interrogatories the jury found that circulation was lost on July 25–26. It further determined that normal circulation as defined by the contract was never regained for the remainder of the job. The jury found also that the drill pipe became stuck during a lost circulation day work period. The court entered judgment, including attorney's fees, in accordance with the jury's findings.

■ Sohio's appeal stands on the proposition that this contract was unambiguous and its interpretation should never have been submitted to the jury. Both sides agree that the preliminary question of whether a contract is ambiguous is one of law for the court to decide, *e.g., Hennigan v. Chargers Football Co.,* 431 F.2d 308 (5th Cir. 1970). But, Sohio says the court decided that question wrongly. It urges us to reverse and render judgment based on the unambiguous meaning which it asserts the contract conveys.

■ Sohio claims that the contract is unambiguous because, read as a whole, it has a certain and definite meaning which gives life to the intention of the parties. *See, e.g., City of Pinehurst v. Sposner Addi-*

*tion Water Co.,* 432 S.W.2d 515 (Tex.1968); *Myers v. Gulf Coast Minerals Management Corp.,* 361 S.W.2d 193, 197 (Tex.1962); *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154 (1951). Startex replies that at least two meanings are equally plausible. It is more apt to say that the undefined technical terms on which the contract's application to the present dispute depends convey little meaning without explanation. So, while we agree with Sohio that we are free to determine the ambiguity question anew, *In re Stratford of Texas, Inc.,* 635 F.2d 365, 368 (5th Cir. 1981), we also affirm the district court's ruling that the contract is ambiguous. Thus it was proper to submit to the jury the evidence from both sides as to the meaning attached to these technical terms by the parties, and by the industry. *See, e.g., Raney v. Uvalde Producers Wool & Mohair Co.,* 571 S.W.2d 199, 200 (Tex.Civ.App.1978 *writ ref'd n.r.e.*) (parol evidence admissible under U.C.C. §§ 2.202 & 1.205 to explain the meaning of terms in the industry).

■ Our task, then, is simply to see if the jury's verdict has an evidentiary basis. If so, we must let it stand. *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946). Here, both sides offered plausible explanations to the jury of the meaning of the disputed terms. Sohio argued that the explanation for the footage rate/day rate distinction was a simple one. When the contractor is making drilling progress it gets paid by the foot and is only entitled to a day rate when no footage progress is being made. Accordingly, Sohio defined loss of circulation as a loss of fluid sufficient to stop drilling progress, regardless of the particular percentage of returns that might be involved. Sohio told the jury the proof is in the drilling. It contended that it was incongruous for Startex to claim a day rate for periods like July 26–29 when it drilled over 1000 feet—irrespective of what its returns were. This absurd construction meant that a day rate should be paid when even a single drop of fluid doesn't return to the surface.

Sohio further contended that partial returns are customary in the Sprayberry Trend. Even if having partial returns slows drilling progress, as Startex claimed, it was to be anticipated by the contractor in making his bid. The contractor could simply set a higher footage basis to compensate for those slower periods. Sohio also contends because partial returns are normal in that area partial circulation fits the definition of normal circulation as intended by the parties in paragraph 8.6. After the period of total loss of circulation July 25–26, Startex resumed drilling progress with partial returns of up to 80%. Thus, normal circulation for this area was restored. Because the drill pipe stuck during this normal condition, Startex became liable for the fishing job.

Sohio's other argument to the jury was predicated on the language of paragraph 8.6 that the operator must concur in the loss of circulation condition before the contractor can receive a day rate. Sohio's witnesses testified that because a contractor on day work is being paid by the hour, and not for his progress, it is customary in the industry for the operator, after concurring, to take over and minimize the time the contractor spends on day work. The jury was told that the surest sign in the industry of whether a contractor is on day work is to look to see who's in charge of the well—if it is day work, the operator will always be in charge. If he's not there, it is understood that the job is by the foot. This occurred when Sohio took over the well for five hours on July 26. Sohio claimed that when its man left the rig, Startex resumed control, and with it the footage rate. Similarly, the fishing job, performed completely with Startex in control, assertedly showed both parties' understanding that Startex should bear the expense. Sohio's witnesses testified that if Sohio had been in control, the fishing job wouldn't have taken a month.

Startex opposed Sohio's interpretation of these contractual terms. It explained that the day rate is negotiated not just to protect the contractor when drilling progress has ceased, but also when it slows. Startex sponsored testimony that a contractor submits his bid based in part on the mud program (i.e. the drilling fluid) specified on the drilling order. Here, that mud program essentially called for the use of water and oil emulsion. Both sides' witnesses agreed that when the contractor loses circulation, it must inject special materials into the drilling fluid such as gels, paper, cottonseed hulls, and fiber. This is done to plug the leaks in the formation and regain circulation. Adding these materials not only slows down drilling because they are thicker than water, but the materials themselves are an additional expense. Startex argued that the footage rate isn't designed to compensate for the added expense and diminished progress occasioned by a change from the mud program specified in the drilling order. Startex's ultimate position was that in light of the admitted loss of circulation on July 25–26 the question became: when was normal circulation restored? It submits the jury properly answered—never, because Startex was unable to get back to the specified mud program. So, in rebuttal to Sohio's claim that the determining factor is who's in control of the well, Startex said the proper indication was to look at the mud program.

Startex also attacked Sohio's argument that a day rate can't be collected when drilling progress is being made. It pointed out that drilling progress was made during the July 25–26 period when Sohio concurred the day work rate was applicable.

To rebut Sohio's argument that its lack of concurrence in contracting with a third party to fish out the stuck pipe negated its liability, Startex referred to the specific provisions of paragraph 8.6 in the contract. That paragraph only requires operator concurrence that "loss of circulation [has occurred] while normal drilling operations are in progress on a footage basis." Startex asserts that it got Sohio's concurrence in the existence of this condition. As already mentioned, a special unscheduled mud program continued until the drill pipe became stuck, and Startex contends that this established that normal circulation was never

restored. Because the contract has no requirement of further concurrence beyond that pertaining to the initial eight hour loss of circulation, the proof established that Sohio was automatically responsible for expenses in connection with a sticking drill pipe.

From the foregoing we determine that both sides presented plausible evidence to support their differing versions as to the meaning and effect of these technical contractual terms. The jury's answers to the interrogatories reflect acceptance of Startex's version. The verdict has a sufficient evidentiary basis. The judgment entered on that verdict is

AFFIRMED.