NO. 07-01-0224-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



DECEMBER 14, 2001


______________________________



MICHAEL CHISHOLM et ux LINDA CHISHOLM
,




 Appellants


v.



BARRY MARON, M.D., 




 Appellee

_________________________________



FROM THE 84TH DISTRICT COURT OF HUTCHINSON COUNTY;



NO. 32,382-A; HON. WILLIAM D. SMITH, PRESIDING


_______________________________



Before BOYD, C.J., QUINN and JOHNSON, J.J.

 Michael and Linda Chisholm appeal an order dismissing their suit against Barry
Maron, M.D. The latter had moved for dismissal because the Chisholms allegedly failed
to timely serve him with an expert's report as per §13.01(d)(1) of the Texas Revised Civil
Statutes. The trial court agreed with Maron, and granted the motion. On appeal, the
Chisholms assert three points of error. The first concerns whether Maron acted timely. 
The second and third involve whether the court acted prematurely or upon "testimony
given by the Plaintiffs' expert." We overrule each and affirm the order of dismissal. 


Background


 On March 11, 1997, the Chisholms filed suit against Maron alleging medical
malpractice resulting in an injury to Michael. The injury allegedly consisted of trauma to
his right sciatic nerve which occurred during hip replacement surgery. Maron filed a
motion to dismiss the action on January 21, 1999, contending that the Chisholms failed to
timely comply with §13.01 (a) and (d) of the Texas Medical Liability and Improvement Act
(the Act). That is, Maron contended that they had not timely furnished him with an expert's
report summarizing the supposed malpractice committed by him. The Chisholms sought
and received a thirty day extension of time to file the report. Within that extended period,
the Chisholms filed what they apparently considered to be a report and resume satisfying
the Act. Maron thought otherwise and again moved to dismiss. Through his motion, he
urged that the report failed to show that the person opining about Maron's supposed
negligence "possessed the qualifications" of an expert. The trial court set the matter for
hearing and subsequently granted the motion and dismissed the suit. 

 Standard of Review


 Whether the trial court erred in dismissing the cause depends upon whether it
abused its discretion. American Transitional Care Ctrs. of Tex. Inc. v. Palacios, 46 S.W.3d
873, 877 (Tex. 2001); Hanzi v. Bailey, 48 S.W.3d 259, 262 (Tex. App.-San Antonio 2001,
pet. denied). Next, whether a trial court abused its discretion is dependent upon whether
it acted without reference to any guiding rules or principles or without evidentiary support
underlying its decision. Id. 

Application of Standard


 As previously mentioned, the Chisholms assert three points of error. To adequately
address them, however, we first discuss the statutory provisions involved and their
meaning. Specifically, one suing another for medical malpractice must

 [n]ot later than the later of the 180th day after the date on which a health care
liability claim is filed or the last day of any extended period . . . (1) furnish to
counsel for each physician . . . one or more expert reports, with a curriculum
vitae of each expert listed in the report; or (2) voluntarily nonsuit the action
against the physician. . . .


Tex. Rev. Civ. Stat. Ann. art. 4590i, §13.01(d) (Vernon Supp. 2001). Should the plaintiff
not do so, then the trial court must

 . . . on the motion of the affected physician . . ., enter an order awarding as
sanction against the claimant or the claimant's attorney: (1) the reasonable
attorney's fees and costs of court incurred by that defendant; (2) the
forfeiture of any cost bond respecting the claimant's claim against that
defendant to the extent necessary to pay the award; and (3) the dismissal of
the action of the claimant against that defendant with prejudice to the claim's
refiling. 


Id. at §13.01(e). However, if a report is timely filed, the opponent may still challenge its
adequacy. 

 Next, to be an adequate expert report within the purview of the Act, it must be
written by an expert and provide a fair summary of that expert's opinions regarding the
applicable standards of care, the manner in which the care rendered deviated from those
standards, and the causal relationship between the deviation and the injury allegedly
suffered. Id. at §13.01(r)(6). In other words, the expert must do more than merely voice
his opinions in the report. He is obligated to also inform the defendant of the specific
conduct called into question and provide a basis for the trial court to conclude that the
claims have merit. American Transitional Care Ctrs, of Tex. Inc. v. Palacios, 46 S.W.3d
at 879; Wright v. Bowie Mem'l Hosp., 48 S.W.3d 443, 446 (Tex. App.-Fort Worth 2001,
pet. filed). 

 So too must the report state the name of the purported expert and establish his
qualifications as an expert. Schorp v. Baptist Mem'l Health Sys., 5 S.W.3d 727, 732 (Tex.
App.--San Antonio 1999, no pet.) (holding that the report did not meet the requirements
of §13.01(d) because it omitted the expert's name and qualifications). That the conclusion
reached in Schorp is accurate is evinced by both statute and Supreme Court precedent. 
For instance, in defining the term "expert report," the legislature stated, in part, that the
document consists of a "written report by an expert . . . ." Tex. Rev. Civ. Stat. Ann. art.
4590i, §13.01(r)(6). Furthermore, "expert" as defined by the same legislative body, means
"an expert qualified to testify under the requirements of" art. 4590i, §14.01(a) of the Act. 
Id. at 13.01(r)(5)(A) (emphasis added). So, before a document can be considered an
expert report, it must be rendered by one qualified to testify as an expert on the particular
subject-matter. And, because we are restricted to "the four corners of the document" in
determining whether the report complied with the demands of §13.01, American
Transitional Care Ctrs. of Tex. Inc. v. Palacios, 46 S.W.3d 873, 878 (Tex. 2001), and the
document must be that of a qualified expert, it follows that it must illustrate that the person
rendering the opinion therein is a qualified expert. Indeed, anything less would fall short
of providing a basis for the trial court to conclude that the claims have merit. See
American Transitional Care Ctrs. of Tex. Inc. v. Palacios, 46 S.W.3d at 879 (stating that
the report must provide the trial court basis upon which to conclude that the claims have
merit). This is so because claims of medical malpractice without testimonial support from
a qualified expert lack merit. Id. at 876-77.

 Finally, the legislature has also dictated the requirements for qualifying as an expert
in a medical malpractice case. According to that body, the individual must 1) be practicing
medicine at the time the opinion is rendered or at the time the claim arose, 2) have
knowledge of accepted standards of medical care for the diagnosis, care or treatment of
the illness, injury, or condition involved in the claim, and 3) be qualified on the basis of
training or experience to offer an expert opinion regarding those accepted standards of
medical care. Tex. Rev. Civ. Stat. Ann. art. 4590i, §14.01(a)(1),(2), & (3). With this said,
we turn to the points asserted by the Chisholms.

 Here, Maron moved to dismiss the suit because the supposed expert report
tendered by the Chisholms did not illustrate that its creator, Elliot B. Oppenheim, M.D., was
a qualified expert. That is, it allegedly failed to illustrate that the doctor was 1) trained or
experienced in the field of orthopedic surgery (i.e., Maron's field of practice) or 2) actively
practicing or providing medical care services in that particular field. In granting the motion
and dismissing the suit, the trial court obviously agreed with Maron. 

 On appeal, the Chisholms suggest that the report did show Oppenheim satisfied the
second criteria because his resume indicated that he had written various articles read by
others. Assuming arguendo that simply writing articles for a journal constitutes the
practice of medicine for purposes of §14.01(a), the Chisholms do not argue that
Oppenheim's vita established that he had experience in the field of orthopedic surgery. 
That is also required. (1) Instead, they seek reversal by urging that 1) Maron waived
complaint because it was untimely raised and 2) Oppenheim had to be deposed or
evidence (apart from the report itself) had to be developed regarding his qualifications
before the trial court could dismiss the suit. We disagree.

 Concerning the matter of waiver, the Chisholms are correct in arguing that statute
obligates one objecting to the qualifications of an expert to do so "not later than the later
of the 21st day after the date the objecting party receives a copy of the witness's [resume]
or the date of the witness' deposition." Tex. Rev. Civ. Stat. Ann. art. 4590i, §14.01(e). 
Yet, Maron did not object to Oppenheim's qualifications of an expert. Rather, he
contended that the Chisholms did not comply with art. 4590i, §13.01(d). Moreover, they
failed to comply because the report in question does and did not illustrate that Oppenheim
was qualified, as required by Schorp and the other authorities we discussed above. 

 Simply put, there is a difference between questioning an expert's qualifications and
questioning a plaintiff's compliance with art. 4590i, §13.01(d). Through the latter, the
complainant is not necessarily saying the expert is unqualified. Instead, he questions
whether the report satisfied the conditions mandated by the legislature via art. 4590i,
§13.01(d). Those are distinct topics. And, because they are distinct, the time limitation
applicable to one's objecting to the qualifications of an expert do not apply to objections
involving compliance with §13.01(d). That the legislature intended this to be true is also
depicted by the wording of §14.01(e). There, the legislature stated that "pretrial objections
to the qualifications of a witness under this section. . . ." must occur within the time allotted
in §14.01(e). See Tex. Rev. Civ. Stat. Ann. art. 4590i, §14.01(e) (emphasis added). In
using the passage "under this section," the legislature was undoubtedly referring to art.
4590i, §14.01, not §13.01. Given this, we eschew the invitation of the Chisholms to
engraft the time restriction expressed in §14.01(e) into §13.01. If the legislature wanted
the limitation to apply, it would have written the Act differently.

 As to the remaining contentions of the Chisholms, to hold that a defendant must
obtain evidence of the expert's qualifications from a source other than the expert report
before contending that the report fails to establish the expert's credentials is to ignore
Palacios. The same is true with the proposition that the trial court must have before it
evidence, apart from the expert's report, before dismissing the suit under art. 4590i,
§13.01(e). Again, the Texas Supreme Court restricted the trial court to the four corners
of the expert report when determining the adequacy of the report. American Transitional
Care Ctrs. of Tex. Inc. v. Palacios, 46 S.W.3d at 878. So, the defendant is not required
to garner, nor must the trial court have before it, evidence other than the report before the
cause can be dismissed due to non-compliance with §13.01(d). 

 Accordingly, the order dismissing the cause with prejudice is affirmed



 Brian Quinn

 Justice


Publish.
1. Again, statute obligates the purported expert to have practiced medicine at the time the report was
made or the claim arose, to have knowledge of the applicable standard of care, and to be qualified on the
basis of training or experience to offer an expert opinion regarding the applicable standard of care. Tex.
Rev. Civ. Stat. Ann. §14.01(a)(1) & (3) (Vernon Supp. 2001). 



tions." To adopt appellants' apparent position that word-of-mouth in
a small community such as King County is sufficient to fall within the purview of
dissemination by "means of public communications" as used in the Rule would be to
effectively rewrite the Rule and tell the trial court it abused its discretion by failing to do so. 
We decline to start down that road.

 Whether Jones' attorneys sought to influence members of the venire by
communicating with non-members is a fact question for resolution by the trial court. We
have noted that it is undisputed that Jones' attorneys took steps to ensure that no 
members of the venire participated in the mock trial. There was not, however, any
evidence that Jones' attorneys asked if family members of the mock trial participants had
been summoned to serve on the jury venire in the case, nor was there any showing that
the attorneys had instructed the participants not to speak about the case to others in the
community before the trial.

 Appellants also emphasize the evidence that the mock trial concluded just hours
before the local junior high football game and that there was testimony that news of the
outcome of the mock trial and the verdict of seven million dollars "spread like wildfire" in
the county. That emphasis arises from the testimony of venire member Pettiet's statement
that "Y'all got to understand . . . we're a big county but we don't have many people and it
just spreads like wildfire, and it goes to the school and the post office and the courthouse. 
That's all we've got." Taken in context, use of the plural "spreads" is referring to the
pronoun "it" and refers to news generally, rather than the specific news about the mock trial
outcome. Thus, that statement was a general description of the county's culture rather
than evidence establishing the extent to which information about the mock trial reached
members of the venire. Pettiet gave much more specific information about his view as to
the community's knowledge about the facts before the mock trial and the damages they
found.

 As we have noted, in order to grant a mistrial, even assuming arguendo there was
misconduct, the trial court must find the misconduct was material and probably resulted in
injury. Tex. R. Civ. P. 327(a). In advancing the proposition that harm may be inferred from
the misconduct itself, appellants point to Texas Employers Ins. Assoc. v. McCaslin, 317
S.W.2d 916 (Tex. 1958) for that proposition. We agree that McCaslin supports that
proposition, however, it does not stand for the proposition that such an inference is
mandatory and irrefutable. In determining probable injury, we are to consider the record
as a whole. Here, the record shows the voir dire examination of the jury venire included
rather detailed exploration of the relationships between venire members and participants
in the mock trial. The parties had a full opportunity to inquire into what, if any, information
had been conveyed to each venire member and what effect it might have on them.

 Out of a venire of 130 people, the parties sought, and were granted, four strikes for
cause. Appellants have failed to identify any specific members of the jury they were forced
to accept because they were denied additional strikes for cause. Based on the record
before us, we cannot say the trial court abused its discretion in denying appellants' mistrial
motions. We overrule Palmer's first, and Primrose's second issues.

 We next consider the failure of the trial court to submit a jury question on Primrose's
right of control over Palmer. The common law doctrine of negligence requires a showing
of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty;
and 3) damages proximately resulting from the breach. El Chico Corp. v. Poole, 732
S.W.2d 306, 311 (Tex. 1987). The existence of a defendant's duty to the plaintiff is the
threshold inquiry in a negligence case and has presented difficulty for many courts in the
context of a premise occupier's duty to contractors' employees. The determination of duty
is a question of law for the court to decide from the facts surrounding the occurrence. Id. 
Because any liability of Palmer in this case must be derivative of Primrose's liability, our
duty inquiry must necessarily focus on Primrose.

 The two potential sources of Primrose's duty to Jones are as the occupier of the
premises and as the general contractor in drilling the well. An owner or occupier of land
generally has a duty to use reasonable care to make and keep the premises safe for
business invitees. Clayton W. Williams, Jr. v. Olivo, 952 S.W.2d 523, 527 (Tex. 1997). As
general contractor for the well, there were two potential sources of Primrose's duty to
maintain safe premises. It could be liable for injuries arising from premises defects or from
negligent activity. Id. at 527. A claim that is the contemporaneous result of negligence is
a negligent activity claim rather than one for premises defect. Keetch v. Kroger Co., 845
S.W.2d 262, 264 (Tex. 1992) (premise defect); Redinger v. Living, Inc., 689 S.W.2d 415
(Tex. 1985) (negligent activity). Under the facts of this case, Jones' claim is one for
negligent activity.

 As a general rule, a property owner or a general contractor does not have a duty to
see that an independent contractor performs the work in a safe manner. Abalos v. Oil
Development Co., 544 S.W.2d 627 (Tex. 1976). An exception exists when the general
contractor retains or exercises control over the subcontractor's activities. Redinger, 689
S.W.2d at 418. In that circumstance, the general contractor owes a duty to exercise
reasonable care in the supervision of the subcontractor's activity. Id. 

 In advancing their challenge, appellants cite the rule that a plaintiff must obtain a
finding on each essential element of their cause of action or face reversal unless the
opponent did not object to the failure to submit a question on the issue or the element is
established as a matter of law. McKinley v. Stripling, 763 S.W.2d 407, 410 (Tex. 1989). 
Absent waiver, the missing element cannot be deemed found pursuant to Rule 279. 
Physicians & Surgeons General Hosp. v. Koblizek, 752 S.W.2d 657, 660 (Tex. App.--Corpus Christi 1988, writ denied).

 In response to appellants' argument about the right of control question, Jones
presents two arguments: 1) Primrose's right of control is established as a matter of law by
the contract between it and Palmer, and 2) appellants waived any complaint arising from
the omission of a control finding. Jones' contract argument requires a consideration of
relevant portions of the contract between Palmer and Primrose. The contract was a
standard "footage drilling contract" and provided that Primrose was to pay Palmer $10 per
foot to drill and install casing in the well to a depth of 3600 feet. It also provided "all drilling
below the . . . specified contract depth shall be on a day work basis as defined herein." 
The contract went on to specify a maximum depth of 3650 feet.

 The Term "footage basis" means contractor [Palmer] shall furnish the
equipment, labor, and perform services . . . to drill a well as specified by
[Primrose] to the contract footage depth. . . . While drilling on a footage basis
[Palmer] shall direct, supervise, and control drilling operations and assumes
certain liabilities to the extent specifically provided for herein. . . . The term
"daywork basis" means [Palmer] shall furnish equipment, labor, and perform
services as herein provided, for a specified sum per day under the direction,
supervision and control of [Primrose]. Except for such obligations and
liabilities specifically assumed by [Palmer, Primrose] shall be solely
responsible and assumes liability for all consequences of operations by both
parties while on a daywork basis, including results and all other risks or
liabilities incurred in or incident to such operations.


Because it is undisputed that the well exceeded 3600 feet in depth, Jones argues the
contract became a day work contract, giving control to Primrose the moment the drill bit
exceeded 3600 feet and all subsequent operations were conducted on a day work basis. 
Appellants argue that the provisions governing day work only applied to work performed
below the 3600-foot contract depth. We agree with that interpretation of the contract.

 Neither party cites authority construing the relevant provisions of this standardized
contract and, likewise, we have found a paucity of such authority. However, in Cleere
Drilling Co. v. Dominion Exploration & Production, 2002 U.S. Dist. LEXIS 4424 (N.D. Texas
Mar 18, 2002), the court construed a similar contract observing that the parties "had
obviously contemplated the fluctuating nature of the Contract's basis." Id.

 When construing a written contract, our goal must be to determine the shared intent
of the parties as expressed in the agreement. National Union Fire Ins. v. CBI Industries,
Inc., 907 S.W.2d 517, 520 (Tex. 1995). Paragraph 4.7(a) of the contract provides that
work done on a day work basis includes "all drilling below the contract footage depth as
provided in Par. 3.1 including the setting of any string of casing below such depth." The
evidence confirms that casing is only installed after the well is drilled. See also Cox v. KTM
Drilling, Inc., 395 S.W.2d 851, 853 (Tex.Civ.App.-Amarillo 1965, writ ref'd n.r.e.). Thus,
if, as Jones contends, after drilling below the contract depth of 3600 feet, all operations
were governed by the contract's day work provisions, the reference in paragraph 4.7
relating to setting casing below that depth would not be necessary. Additionally, paragraph
7.1 of the contract specifically states that casing set "below the footage contract depth"
would be on a day work basis.

 Other provisions of the contract contemplate temporary operations on a day work
basis with a return to a footage basis. For example, paragraph 4.7 provides that any repair
work or work beyond that specified in the contract would be on a day work basis. When
construing a contract, we must consider the entire agreement giving effect to each of its
provisions. Small & Associates, Inc. v. Southern Mechanical, Inc., 730 S.W.2d 100, 104
(Tex. App.--Dallas 1987, no writ). The construction of the contract urged by Jones would
require us to ignore the reference to setting casing contained in paragraph 4.7(a).

 For the reasons we have explicated, we hold the contract does not reveal an intent
that all operations conducted after the well exceeded the footage contract were to be
conducted on a day work basis. We are mindful of Jones' argument that this construction
might result in some difficulty in knowing which provisions govern at any particular point in
the operation. See Startex Drilling Co. v. Sohio Petroleum Co., 680 F.2d 412, 416 (5th Cir.)
(discussing the determination as to whether drilling is operating on a footage or day work
basis); Samson Resources Co. v. Quarles Drilling Co., 783 P.2d 974 (Okla. 1989) (finding
contract required notice to operator of change from footage to day work basis). However,
this possibility cannot justify us in departing from the plain language of the contract or the
rules of construction.

 The record is not clear how much casing had been run in the well when Jones's
injury occurred. It does reveal that the crew began having problems after running just a
few joints. The record does not show how many joints were put in before Jones's injury,
but there is evidence that six to ten joints were run after the injury, thus indicating that the
injury did not occur while working at the bottom of the well. Jones's burden to show duty
made it incumbent on him to establish the parties were operating under the day work
provisions of the contract. The evidence is legally insufficient to support such a finding. 
Thus, we reject Jones' argument that Primrose's right of control over Palmer's operations
was established as a matter of law. 

 In their third issue, Jones argues that the evidence was legally and factually
sufficient to show Primrose's representative retained the right to forbid unsafe practices. 
 In supporting that argument, Jones correctly cites the rule that when "considering a factual
sufficiency issue, the reviewing court reviews all the evidence . . . and reverses only if the
challenged finding is so against the great weight and preponderance of the evidence as
to be manifestly unjust." (Emphasis added). However, because Jones failed to obtain a
jury finding on Primrose's right of control, a review for factual and legal sufficiency is not
applicable. They are limited to showing that Primrose's control over Palmer was
established as a matter of law. McKinley, 763 S.W.2d at 410.

 We next consider the argument presented in Jones' fourth issue, namely, that any
error arising from the failure to obtain a finding on Primrose's control over Palmer was
waived. Primrose submitted a list of proposed jury questions, definitions, and instructions. 
The individual items are not marked as granted or denied, but the document is file marked
September 14, 2000. As relevant here, it contained the following proposed question: "Did
Primrose Operating Company control the means, methods, and details of Palmer Oilfield
Construction Company's work on the casing operation in question?" It went on to list
several rights that would not amount to control. An identical question was requested with
regard to Primrose's control over Byrd.

 At the charge conference, Primrose presented its objections to the court's charge,
specifically pointing out its request for definitions on negligence, dangerous conditions, and
a request for "the court to submit on [sic] did Primrose Operation Company control the
means, methods and details of Byrd Casing Crews' work on the casing operation in
question." It did not specifically identify its question with regard to its control over Palmer's
work. The trial court stated, "[t]he exceptions and objections presented by defendant
Primrose are denied." Palmer adopted Primrose's objections and urged additional
requests and objections of its own. See Tex. R. Civ. P. 279.

 Citing Carr v. Smith, 22 S.W.3d 128 (Tex.App.--Fort Worth 2000, pet. denied),
Jones argues Palmer's purported adoption of Primrose's written requests was ineffective,
resulting in a waiver by Palmer also. However, Carr did not involve an express adoption
of another party's requests or objections in the trial court. Thus, it is not applicable here.

 The question now presented to us is whether Primrose's failure to orally argue each
question submitted by it to the trial court resulted in a waiver of the questions not
specifically identified in the charge hearing. The standard for reviewing the sufficiency of
requests and objections to the jury charge is articulated in State Dept. of Highways &
Public Transp. v. Payne, 838 S.W.2d 235 (Tex. 1992). In the course of its opinion, after
commenting on the complexity previously existing in our jurisprudence to preserve charge
error, the court adopted a simple rule to do so. It opined that the relevant inquiry is
whether the request "called the trial court's attention to the issue." Id. at 239-40. The court
continues to adhere to this test. See Coastal Liquids Transp., L.P. v. Harris County
Appraisal Dist., 46 S.W.3d 880, 885 n.14 (Tex. 2001). Even so, this standard must be
applied in the context of Rule of Civil Procedure 274's admonition making requests
"obscured or concealed by . . . numerous unnecessary requests." However, here,
Primrose's written requests for jury questions regarding its control of Palmer and Byrd, as
well as its oral presentation of control over Byrd, were sufficient to call the trial court's
attention to the issues and thus preserve the question for appellate review. 

 Thus, we must sustain Primrose's first issue and Palmer's second issue and hold
that Jones failed to establish Primrose's duty to him. Because duty is a necessary element
of Jones' negligence claim, our holding requires us to reverse the trial court judgment
against Primrose. That disposition also requires reversal of Primrose's claim for
indemnification against Palmer. In summary, that holding requires that we reverse the
judgment of the trial court and render judgment that Jones take nothing against Primrose
and Palmer. 


 John T. Boyd

 Senior Justice 
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003). 
2. The Jones parties call this meeting a "focus group" while appellants refer to it as
a "mock trial." The substance of what took place at the meeting is essentially undisputed,
making the nomenclature irrelevant. For simplicity, we will refer to it as a mock trial.
3. This was the veterinarian at the 6666 Ranch who had authorized the Jones' use
of a conference room at the ranch.
4. Palmer's reliance upon Elston v. Sherman Coca Cola Co., 596 S.W.2d 215
(Tex.Civ.App.--Texarkana 1980, no writ), for the proposition that review of a denial of a
motion for new trial is de novo is misplaced. The case actually held the question of injury
from juror misconduct is a question of law for the court. Id. at 218.