NO. 07-01-0275-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JANUARY 24, 2003

_____

PRIMROSE OPERATING COMPANY, INC. AND
PALMER OILFIELD CONSTRUCTION INC., APPELLANTS

V.

WALTER JAMES JONES, III AND JONA JONES, INDIVIDUALLY AND AS NEXT
FRIENDS OF ALLISHA AND TY JONES, MINOR CHILDREN, APPELLEES

_____

FROM THE 50TH DISTRICT COURT OF KING COUNTY;

NO. 99-589; HONORABLE DAVID HAJEK, JUDGE

_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

OPINION

This is an appeal from a judgment awarding damages for injuries arising from an

oilfield accident. In the judgment, Walter James Jones III and his wife Jona Jones,

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003).

individually and as next friend of their minor children, were awarded approximately 2.7 million dollars in actual and exemplary damages. These parties will be collectively referred to as Jones. The trial court defendants were Primrose Operating Company (Primrose), Palmer Oilfield Construction Company (Palmer), and Mike Byrd Casing Crews, Inc. (also referred to as Byrd Power Tong Service, Inc.). Each defendant filed a notice of appeal, but Byrd subsequently settled with Jones and is not a party to this appeal. Finding merit in Primrose's first issue and Palmer's second issue, we reverse the judgment of the trial court and remand the cause for further proceedings in accordance with our opinion.

The background of this appeal begins with the fact that Primrose was the operator of an oil and gas well in King County. It contracted with Palmer to drill the well and run casing down to 3600 feet on a per-foot basis. Additional work, to a maximum of 3650 feet, would be on a day work basis. Walter Jones was an employee of Palmer. Palmer, in turn, hired Byrd to perform part of the work, including supplying power tongs and elevators. In July 1997, soon after installation of the casing had begun, the crew encountered difficulty raising joints of casing into place for assembly. The difficulty arose because handles on the elevator struck the derrick while the casing was raised. Some of the workers felt the handles on the elevator were too long. However, no other elevator was available and the work continued.

On one occasion, the elevator handles hung on the derrick and, before the driller could stop the winch, the handles acted as a lever, causing the free-hanging end of the

casing joint to swing out. As it swung back down, the casing struck Jones on the back of his head, causing him the injuries for which recovery was sought.

The Jones parties filed suit against Primrose and Byrd Casing. Primrose sought indemnification from Palmer under their written agreement. Palmer's worker's compensation carrier, Old Republic Insurance, filed a plea in intervention asserting it was subrogated to any recovery Jones obtained. The King County trial jury returned a verdict for Jones in which it found both Primrose and Byrd negligent and attributed 90 percent of the responsibility to Primrose and 10 percent to Byrd. In conformity with the jury's verdict, the trial court rendered judgment for Jones for $2,690,000 in damages, and $741,624 in prejudgment interest. That Old Republic had a subrogation interest of $85,608 in the judgment was undisputed. The trial court also found that Primrose was entitled to indemnification from Palmer in the amount of $1,000,000, together with $77,000 in attorney fees. Each party filed a notice of appeal, but Byrd subsequently settled.

In pursuing its appeal, Palmer presents five issues for our review. They are whether: 1) the trial court erred in denying their motions for mistrial based on a tainted jury panel, 2) the trial court erred in refusing to submit an issue on Primrose's right of control over Palmer, 3) the evidence was legally or factually sufficient to support the finding that Primrose retained a right of control over Palmer and/or Byrd sufficient to create a duty on Primrose to Jones, 4) the delay in obtaining the reporter's record entitles Palmer to a new trial, and 5) the trial court correctly held Primrose was entitled to indemnification from Palmer under the terms of their written contract.

Primrose presents the following issues: 1) whether Jones' failure to secure a finding on its control over Palmer requires reversal of the judgment against Primrose, 2) whether the appearance of partiality on the part of the jurors requires reversal on public policy grounds, 3) whether the trial court erred in awarding damages for loss of consortium for a child born after the injury, and 4) whether Palmer should be required to pay post-judgment interest on its indemnity obligation.

Jones presents six issues in which they ask us to decide whether: 1) a pretrial "focus group" conducted by Jones probably caused any injury, 2) Primrose's right of control was established by the contract between it and Palmer, 3) the evidence was legally and factually sufficient to show Primrose's employee retained a right of control over Palmer's work, 4) Primrose's employee retained a right of control over Palmer's work, 5) Primrose waived its complaint regarding loss of consortium damages for after-born children, and 6) the reporter's record is sufficient for the purposes of this appeal.

Initially, we will consider the issues concerning jury selection, which encompass Primrose's issue two, Palmer's issue one, and Jones' issue one. The facts giving rise to these issues come from what Primrose and Palmer describe as a mock trial[2] conducted before the jury selection in the case. It is undisputed that King County has a population of just over 300. Anticipating some difficulty in obtaining a jury, the district court had the clerk summon 130 veniremen. The jury summons were mailed on Monday, September 12,

_____

[2]The Jones parties call this meeting a "focus group" while appellants refer to it as a "mock trial." The substance of what took place at the meeting is essentially undisputed, making the nomenclature irrelevant. For simplicity, we will refer to it as a mock trial.

2000. At some time prior to September 14, 2000, one of Jones' attorneys contacted Dr. Blodgett, a veterinarian at the 6666 Ranch in King County. He was seeking use of a conference room for a meeting in preparation for the trial, however, he did not explain the nature of the meeting. Another of Jones' attorneys, the lead counsel at trial, spoke to a secretary at the ranch, telling her that they wanted to conduct a "focus group" to help them decide how to best present their case at the upcoming trial.

Jones' attorney asked the secretary to assemble a group who was representative of the county population, but had not been called for jury duty. The secretary assembled a group of approximately seven adults, including a high school teacher and five students from the teacher's seniors government class. On Thursday, September 14, 2000, the group met at the ranch. Some time before the mock trial, the first attorney obtained a list of those summoned for jury duty in the case; however, he did not recall if he provided the list to Jones' trial attorney beforehand.

Jones' trial attorney presided over the mock trial and was unaware who would be participating before he arrived at the ranch. He asked the participants if any of them had been summoned for jury duty in the case and excluded one person who had been called. The attorney did not ask if any of the group's family members had been summoned to the trial venire. At the meeting, Jones' attorney summarized the evidence he expected would be presented by each party in the case using flip charts and a portion of a video deposition. At the conclusion of the meeting, which lasted approximately two hours, the mock jury held Primrose 80 percent responsible and opined that the Jones parties were entitled to

5

$7,000,000 in damages. Each participant was given a $30 restaurant gift certificate for their participation in the mock trial.

The King County Judge learned of the mock trial on the same day that it was conducted. The judge went to the ranch and obtained a list of all the participants. The judge provided the list to the district clerk, who compared it to the members of the jury venire for the purpose of identifying family relationships between members of the two groups and found several relationships between the two lists. A copy of the mock trial list was also furnished to the district judge.

The case was called for trial on Monday, September 18, 2000. Primrose, Palmer, and Byrd learned of the mock trial before the jury voir dire began and jointly moved for a mistrial on the basis that the mock trial had tainted the entire venire. They also objected to Jones' failure to furnish them a list of the participants in the mock trial which, they argued, seriously impaired their ability to conduct an effective voir dire of the panel. The trial court did not rule on the motion immediately, but carried it on during the voir dire examination.

Even so, the effect of the mock trial was significantly explored during the jury voir dire examination. The parties explored the relationships between venire members and mock trial participants, as well as the effect of the mock trial on the community view of the dispute. One venire member, Mr. Pettiet, pointed out that the mock trial concluded only a few hours before a local junior high football game attended by county residents. He was serving food at the game and, he said, the mock trial, including the $7 million damage

6

finding, was a major topic of conversation. He averred he heard about the case "from every direction," and ultimately stated that he could not set aside what he had heard about the case, which resulted in him being struck for cause. The trial court also allowed a strike for cause in the instance of Dr. Blodgett,[3] who had questioned the ethics of the plaintiffs' attorney's actions in conducting the mock trial at the time. At the conclusion of the voir dire, the motion for mistrial was again urged, but it was overruled.

In challenging the refusal of their mistrial motion, both Primrose and Palmer initially argue the trial court erred because Jones' attorney's conduct violated Texas Disciplinary Rules of Professional Conduct 3.06 and 3.07, which address respectively, maintaining the integrity of the jury system and trial publicity. Parenthetically, we note that paragraph 15 of the preamble to the rules specify that they are not designed to be the standards for procedural decisions. Those rules govern disciplinary proceedings and are only applicable to other types of proceedings to the extent they might manifest public policy. *See Shields v. Texas Scottish Rite Hosp. for Crippled Children*, 11 S.W.3d 457, 459 (Tex. App.-- Eastland 2000, pet. denied).

Texas Rule of Civil Procedure 327 governs the instances in which a party is entitled to a new trial because of jury misconduct. That rule authorizes a court, after taking evidence on the alleged misconduct, to grant a new trial if it finds misconduct by the jury, including any communication made to the jury, or that the juror gave an incorrect answer

---

[3] This was the veterinarian at the 6666 Ranch who had authorized the Jones' use of a conference room at the ranch.

during voir dire. Tex. R. Civ. P. 327. By including communications made to the jury, it is clear that "jury misconduct" is not limited to acts of jurors. A trial court's denial of a motion for mistrial will not be disturbed without a showing that the court abused its discretion. *Till v. Thomas*, 10 S.W.3d 730, 734 (Tex.App.--Houston [1st Dist.] 1999, no pet.).[4]

Even construing Disciplinary Rules 3.06 and 3.07 as explicating improper communications under Rule 327, the record does not show the trial court abused its discretion by denying the motion for mistrial. Rule 3.06(a)(2) prohibits an attorney from seeking to influence a venireman or communicate with any member of the venire. Initially, we note that the record reveals only one communication between Jones' attorneys and any member of the venire. That was Jones' trial attorney's conversation in which he discovered that one person included in the group at the 6666 Ranch, who was a member of the jury trial venire, but wanted to serve as a member of the mock trial. It is undisputed that his conversation with the person was limited to explaining that he could not participate in the mock trial. That communication was not improper because it amounted to an effort to avoid a potential violation of Disciplinary Rule 3.06(a).

Rule 3.07 prohibits an attorney from making statements "that a reasonable person would expect to be disseminated by means of public communications" that he should know will have a substantial likelihood of prejudicing a proceeding. There is nothing in the record

---

[4]Palmer's reliance upon *Elston v. Sherman Coca Cola Co.*, 596 S.W.2d 215 (Tex.Civ.App.--Texarkana 1980, no writ), for the proposition that review of a denial of a motion for new trial is *de novo* is misplaced. The case actually held the question of injury from juror misconduct is a question of law for the court. *Id.* at 218.

that shows any of the matters discussed in the mock trial were disseminated by "means of public communications." To adopt appellants' apparent position that word-of-mouth in a small community such as King County is sufficient to fall within the purview of dissemination by "means of public communications" as used in the Rule would be to effectively rewrite the Rule and tell the trial court it abused its discretion by failing to do so. We decline to start down that road.

Whether Jones' attorneys sought to influence members of the venire by communicating with non-members is a fact question for resolution by the trial court. We have noted that it is undisputed that Jones' attorneys took steps to ensure that no members of the venire participated in the mock trial. There was not, however, any evidence that Jones' attorneys asked if family members of the mock trial participants had been summoned to serve on the jury venire in the case, nor was there any showing that the attorneys had instructed the participants not to speak about the case to others in the community before the trial.

Appellants also emphasize the evidence that the mock trial concluded just hours before the local junior high football game and that there was testimony that news of the outcome of the mock trial and the verdict of seven million dollars "spread like wildfire" in the county. That emphasis arises from the testimony of venire member Pettiet's statement that "Y'all got to understand . . . we're a big county but we don't have many people and it just spreads like wildfire, and it goes to the school and the post office and the courthouse. That's all we've got." Taken in context, use of the plural "spreads" is referring to the

9

pronoun "it" and refers to news generally, rather than the specific news about the mock trial outcome. Thus, that statement was a general description of the county's culture rather than evidence establishing the extent to which information about the mock trial reached members of the venire. Pettiet gave much more specific information about his view as to the community's knowledge about the facts before the mock trial and the damages they found.

As we have noted, in order to grant a mistrial, even assuming arguendo there was misconduct, the trial court must find the misconduct was material and probably resulted in injury. Tex. R. Civ. P. 327(a). In advancing the proposition that harm may be inferred from the misconduct itself, appellants point to *Texas Employers Ins. Assoc. v. McCaslin,* 317 S.W.2d 916 (Tex. 1958) for that proposition. We agree that *McCaslin* supports that proposition, however, it does not stand for the proposition that such an inference is mandatory and irrefutable. In determining probable injury, we are to consider the record as a whole. Here, the record shows the voir dire examination of the jury venire included rather detailed exploration of the relationships between venire members and participants in the mock trial. The parties had a full opportunity to inquire into what, if any, information had been conveyed to each venire member and what effect it might have on them.

Out of a venire of 130 people, the parties sought, and were granted, four strikes for cause. Appellants have failed to identify any specific members of the jury they were forced to accept because they were denied additional strikes for cause. Based on the record

before us, we cannot say the trial court abused its discretion in denying appellants' mistrial motions. We overrule Palmer's first, and Primrose's second issues.

We next consider the failure of the trial court to submit a jury question on Primrose's right of control over Palmer. The common law doctrine of negligence requires a showing of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from the breach. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex. 1987). The existence of a defendant's duty to the plaintiff is the threshold inquiry in a negligence case and has presented difficulty for many courts in the context of a premise occupier's duty to contractors' employees. The determination of duty is a question of law for the court to decide from the facts surrounding the occurrence. *Id.* Because any liability of Palmer in this case must be derivative of Primrose's liability, our duty inquiry must necessarily focus on Primrose.

The two potential sources of Primrose's duty to Jones are as the occupier of the premises and as the general contractor in drilling the well. An owner or occupier of land generally has a duty to use reasonable care to make and keep the premises safe for business invitees. *Clayton W. Williams, Jr. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997). As general contractor for the well, there were two potential sources of Primrose's duty to maintain safe premises. It could be liable for injuries arising from premises defects or from negligent activity. *Id.* at 527. A claim that is the contemporaneous result of negligence is a negligent activity claim rather than one for premises defect. *Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex. 1992) (premise defect)*; Redinger v. Living, Inc.*, 689 S.W.2d 415

11

(Tex. 1985) (negligent activity). Under the facts of this case, Jones' claim is one for negligent activity.

As a general rule, a property owner or a general contractor does not have a duty to see that an independent contractor performs the work in a safe manner. *Abalos v. Oil Development Co.,* 544 S.W.2d 627 (Tex. 1976). An exception exists when the general contractor retains or exercises control over the subcontractor's activities. *Redinger*, 689 S.W.2d at 418. In that circumstance, the general contractor owes a duty to exercise reasonable care in the supervision of the subcontractor's activity. *Id.*

In advancing their challenge, appellants cite the rule that a plaintiff must obtain a finding on each essential element of their cause of action or face reversal unless the opponent did not object to the failure to submit a question on the issue or the element is established as a matter of law. *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex. 1989). Absent waiver, the missing element cannot be deemed found pursuant to Rule 279. *Physicians & Surgeons General Hosp. v. Koblizek*, 752 S.W.2d 657, 660 (Tex. App.-- Corpus Christi 1988, writ denied).

In response to appellants' argument about the right of control question, Jones presents two arguments: 1) Primrose's right of control is established as a matter of law by the contract between it and Palmer, and 2) appellants waived any complaint arising from the omission of a control finding. Jones' contract argument requires a consideration of relevant portions of the contract between Palmer and Primrose. The contract was a

standard "footage drilling contract" and provided that Primrose was to pay Palmer $10 per foot to drill and install casing in the well to a depth of 3600 feet. It also provided "all drilling below the . . . specified contract depth shall be on a day work basis as defined herein." The contract went on to specify a maximum depth of 3650 feet.

> The Term "footage basis" means contractor [Palmer] shall furnish the equipment, labor, and perform services . . . to drill a well as specified by [Primrose] to the contract footage depth. . . . While drilling on a footage basis [Palmer] shall direct, supervise, and control drilling operations and assumes certain liabilities to the extent specifically provided for herein. . . . The term "daywork basis" means [Palmer] shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of [Primrose]. Except for such obligations and liabilities specifically assumed by [Palmer, Primrose] shall be solely responsible and assumes liability for all consequences of operations by both parties while on a daywork basis, including results and all other risks or liabilities incurred in or incident to such operations.

Because it is undisputed that the well exceeded 3600 feet in depth, Jones argues the contract became a day work contract, giving control to Primrose the moment the drill bit exceeded 3600 feet and all subsequent operations were conducted on a day work basis. Appellants argue that the provisions governing day work only applied to work performed below the 3600-foot contract depth. We agree with that interpretation of the contract.

Neither party cites authority construing the relevant provisions of this standardized contract and, likewise, we have found a paucity of such authority. However, in *Cleere Drilling Co. v. Dominion Exploration & Production*, 2002 U.S. Dist. LEXIS 4424 (N.D. Texas Mar 18, 2002), the court construed a similar contract observing that the parties "had obviously contemplated the fluctuating nature of the Contract's basis." *Id*.

13

When construing a written contract, our goal must be to determine the shared intent of the parties as expressed in the agreement. *National Union Fire Ins. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Paragraph 4.7(a) of the contract provides that work done on a day work basis includes "all drilling below the contract footage depth as provided in Par. 3.1 including the setting of any string of casing below such depth." The evidence confirms that casing is only installed after the well is drilled. *See also Cox v. KTM Drilling, Inc.*, 395 S.W.2d 851, 853 (Tex.Civ.App.–Amarillo 1965, writ ref'd n.r.e.). Thus, if, as Jones contends, after drilling below the contract depth of 3600 feet, all operations were governed by the contract's day work provisions, the reference in paragraph 4.7 relating to setting casing below that depth would not be necessary. Additionally, paragraph 7.1 of the contract specifically states that casing set "below the footage contract depth" would be on a day work basis.

Other provisions of the contract contemplate temporary operations on a day work basis with a return to a footage basis. For example, paragraph 4.7 provides that any repair work or work beyond that specified in the contract would be on a day work basis. When construing a contract, we must consider the entire agreement giving effect to each of its provisions. *Small & Associates, Inc. v. Southern Mechanical, Inc.,* 730 S.W.2d 100, 104 (Tex. App.--Dallas 1987, no writ). The construction of the contract urged by Jones would require us to ignore the reference to setting casing contained in paragraph 4.7(a).

For the reasons we have explicated, we hold the contract does not reveal an intent that all operations conducted after the well exceeded the footage contract were to be

14

conducted on a day work basis.  We are mindful of Jones' argument that this construction might result in some difficulty in knowing which provisions govern at any particular point in the operation.  *See Startex Drilling Co. v. Sohio Petroleum Co.*, 680 F.2d 412, 416 (5th Cir.) (discussing the determination as to whether drilling is operating on a footage or day work basis); *Samson Resources Co. v. Quarles Drilling Co.,* 783 P.2d 974 *(*Okla. 1989*) (*finding contract required notice to operator of change from footage to day work basis*).*  However, this possibility cannot justify us in departing from the plain language of the contract or the rules of construction.

The record is not clear how much casing had been run in the well when Jones's injury occurred.  It does reveal that the crew began having problems after running just a few joints.  The record does not show how many joints were put in before Jones's injury, but there is evidence that six to ten joints were run after the injury, thus indicating that the injury did not occur while working at the bottom of the well.  Jones's burden to show duty made it incumbent on him to establish the parties were operating under the day work provisions of the contract.  The evidence is legally insufficient to support such a finding. Thus, we reject Jones' argument that Primrose's right of control over Palmer's operations was established as a matter of law.

In their third issue, Jones argues that the evidence was legally and factually sufficient to show Primrose's representative retained the right to forbid unsafe practices. In supporting that argument, Jones correctly cites the rule that when "considering a factual sufficiency issue, the reviewing court reviews all the evidence . . . and reverses only if *the*

*challenged finding* is so against the great weight and preponderance of the evidence as to be manifestly unjust." (Emphasis added). However, because Jones failed to obtain a jury finding on Primrose's right of control, a review for factual and legal sufficiency is not applicable. They are limited to showing that Primrose's control over Palmer was established as a matter of law. *McKinley*, 763 S.W.2d at 410.

We next consider the argument presented in Jones' fourth issue, namely, that any error arising from the failure to obtain a finding on Primrose's control over Palmer was waived. Primrose submitted a list of proposed jury questions, definitions, and instructions. The individual items are not marked as granted or denied, but the document is file marked September 14, 2000. As relevant here, it contained the following proposed question: "Did Primrose Operating Company control the means, methods, and details of Palmer Oilfield Construction Company's work on the casing operation in question?" It went on to list several rights that would not amount to control. An identical question was requested with regard to Primrose's control over Byrd.

At the charge conference, Primrose presented its objections to the court's charge, specifically pointing out its request for definitions on negligence, dangerous conditions, and a request for "the court to submit on [sic] did Primrose Operation Company control the means, methods and details of Byrd Casing Crews' work on the casing operation in question." It did not specifically identify its question with regard to its control over Palmer's work. The trial court stated, "[t]he exceptions and objections presented by defendant

Primrose are denied."  Palmer adopted Primrose's objections and urged additional requests and objections of its own.  *See* Tex. R. Civ. P. 279.

Citing *Carr v. Smith*, 22 S.W.3d 128 (Tex.App.--Fort Worth 2000, pet. denied), Jones argues Palmer's purported adoption of Primrose's written requests was ineffective, resulting in a waiver by Palmer also.  However, *Carr* did not involve an express adoption of another party's requests or objections in the trial court.  Thus, it is not applicable here.

The question now presented to us is whether Primrose's failure to orally argue each question submitted by it to the trial court resulted in a waiver of the questions not specifically identified in the charge hearing.  The standard for reviewing the sufficiency of requests and objections to the jury charge is articulated in *State Dept. of Highways & Public Transp. v. Payne*, 838 S.W.2d 235 (Tex. 1992).  In the course of its opinion, after commenting on the complexity previously existing in our jurisprudence to preserve charge error, the court adopted a simple rule to do so.  It opined that the relevant inquiry is whether the request "called the trial court's attention to the issue." *Id*. at 239-40.  The court continues to adhere to this test.  *See Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.,* 46 S.W.3d 880, 885 n.14 (Tex. 2001).  Even so, this standard must be applied in the context of Rule of Civil Procedure 274's admonition making requests "obscured or concealed by . . . numerous unnecessary requests."  However, here, Primrose's written requests for jury questions regarding its control of Palmer and Byrd, as well as its oral presentation of control over Byrd, were sufficient to call the trial court's attention to the issues and thus preserve the question for appellate review.

Thus, we must sustain Primrose's first issue and Palmer's second issue and hold that Jones failed to establish Primrose's duty to him. Because duty is a necessary element of Jones' negligence claim, our holding requires us to reverse the trial court judgment against Primrose. That disposition also requires reversal of Primrose's claim for indemnification against Palmer. In summary, that holding requires that we reverse the judgment of the trial court and render judgment that Jones take nothing against Primrose and Palmer.


John T. Boyd
Senior Justice