Patrick A. Pirtle, Justice *871 The right of trial by jury shall remain inviolate.
Texas Constitution, Article I, Sec. 15
In its simplest terms, this case involves the issue of whether a trial judge abused his discretion in ordering sanctions against an attorney in a pending civil case. At a more profound level, this case involves the right of a trial court to protect the integrity of the judicial system and to hold "inviolate" the right to trial by jury. For the reasons that follow, we affirm the decision of the trial court to impose sanctions in this case.
BACKGROUND
Appellant, William A. Brewer III, an attorney who represented a defendant in a civil proceeding pending in the 72nd District Court, appeals a sanctions order entered by the presiding judge, the Honorable Ruben G. Reyes, on February 19, 2016. In the underlying civil proceeding, Brewer and his law firm, Bickel & Brewer,[1] represented Titeflex Corporation, Gastite Division, as the primary defendant in a multi-million dollar products liability/wrongful death cause of action arising from an explosion and fire allegedly caused by a defective or unreasonably unsafe corrugated stainless steel tubing ("CSST") product manufactured by Titeflex. The Plaintiffs and Appellees, Ken Teel, Becky Teel, Ross Rushing, Meg Rushing, and State Farm Lloyds Insurance Company, filed suit on October 3, 2012, alleging that a catastrophic fire claimed the life of the Teels' son while at the Rushings' residence. In addition to Titeflex, the Plaintiffs named Appellee, Turner & Witt Plumbing, Inc., among others, as a Defendant. During the course of the proceedings, third-party claims were subsequently made against Appellees, Thermo Dynamic Insulation, LLC, Strong Custom Builders, LLC, and Lennox Hearth Products, LLC.
As a result of this unfortunate explosion, the Chief Building Official and Fire Marshal of the City of Lubbock issued a moratorium concerning the use of certain CSST products pending further investigation. The moratorium led to significant media coverage. In addition to the incident-generated media coverage, Plaintiffs' counsel engaged in multiple public relations activities, including a website about the alleged dangers of CSST and a survey of Lubbock County residents regarding public awareness of the existence of CSST gas plumbing. Similarly, Bickel & Brewer engaged Public Opinion Strategies, a public opinion consulting firm, to "conduct a random independent poll in regard to certain attitudes and opinions that would likely be prevalent among homeowners in Lubbock, Texas." Pursuant to that engagement, Public Opinion Strategies developed a draft of proposed survey questions which Bickel & Brewer attorneys revised.[2] Brewer himself personally approved the final draft of the survey questions.
*872 At the suggestion of Public Opinion Strategies, Brewer agreed on a survey of 300 participants. To complete 300 surveys, Public Opinion Strategies ordered a database of approximately 20,000 names and phone numbers of Lubbock County residents over age eighteen and engaged Survey Sampling International, LLC, (hereinafter "SSI") to make phone calls to randomly selected phone numbers from that database. No one at Bickel & Brewer had any input in selecting the inclusion or exclusion of any name or phone number in the database.
Trial was scheduled to commence on June 30, 2014. Approximately six weeks earlier, over a two-day period ending May 22, SSI conducted randomly selected computer-assisted telephone interviews, using the survey questionnaire approved by Brewer. The questions in the survey were randomized so that different participants would hear the questions in a different order. It is not known how many people in the database were contacted in order to obtain the requested 300 completed surveys.
Six days after the polling was completed, Bickel & Brewer attorneys filed an ethics complaint against two City of Lubbock officials who had been designated as testifying witnesses. That same day, they had copies of the ethics complaint hand-delivered to members of the Lubbock City Council and released to the media.
On June 6, 2014, the Plaintiffs filed a motion seeking "emergency protection" and sanctions as to Bickel & Brewer, alleging the telephone survey constituted an improper trial preparation tactic designed to (1) intimidate witnesses, (2) "infect and contaminate the jury pool," and (3) secure a delay in the trial date. As a basis for that relief, the motion alleged that certain third parties had been contacted by SSI during the survey process in an "overt attempt to convince them who to blame for CSST failures in homes, in and around Lubbock, Texas."[3] The motion alleged that when initially asked by Plaintiffs' counsel as to whether polling was being conducted in Lubbock concerning the pending litigation, Brewer denied any knowledge of the poll.
On June 9, 2014, in anticipation of the scheduled June 30 trial date, the trial court was conducting a pretrial hearing on the issue of disqualifying various designated witnesses. During that hearing, Plaintiffs' counsel raised the issue of the telephone survey. After some discussion regarding the necessity and availability of witnesses, the hearing was recessed until the next day. On June 10, after further discussion with counsel regarding the survey and the circumstances surrounding it, the trial judge referred to the matter as "disturbing." On June 11, additional defendants and designated responsible third-party defendants filed similar motions seeking sanctions against Bickel & Brewer. Further hearings were held on June 11, 16, 17, and 27. Finally, on June 27, in open court, Titeflex discharged Bickel & Brewer, citing the sanctions motions as the reason. As a result of this development, trial did not commence as planned on June 30.
The trial court did, however, set a hearing on the sanctions motions for September 29, 2014. On September 17, Bickel & Brewer filed a verified motion for continuance seeking additional time to gather admissible evidence from third parties in support of its opposition to the motions. Attached to Bickel & Brewer's motion was the verification of James S. Renard, a Bickel & Brewer attorney, who stated that *873 he had "read the facts set forth in the foregoing Motion to Continue Sanctions Hearing ... which are true and correct based upon his personal knowledge and reasonable inquiry." The next day, the trial court denied Bickel & Brewer's motion for continuance and the sanctions hearing commenced as scheduled, picking up where it had ended on June 17. The trial court heard four additional days of testimony from fact and expert witnesses and it received documentary evidence on the matter of sanctions. The sanctions hearing concluded on October 2, and the trial court took the matter under advisement.
Fifteen months later, on January 22, 2016, after taking into consideration "the motions, argument and briefing of counsel as well as the evidence presented-including but not limited to the conflicting testimony and credibility of the witnesses," the trial court issued a letter ruling imposing sanctions against Brewer, individually, while imposing no sanctions against the firm of Bickel & Brewer. The letter ruling ordered that Appellees recover from Brewer fees and expenses totaling $133,415.27, plus contingent fees and expenses totaling $43,590.00.[4] In addition, the trial court ordered Brewer to successfully complete ten hours of continuing legal education on the topic of ethics. In the meantime, the merits of the underlying case were settled by all parties, and on February 19, 2016, the trial court entered its Order on Sanctions Motions ... and Final Order of Dismissal, dismissing all claims, save and except the sanctions imposed against Brewer. A notice of appeal regarding the sanctions order was timely filed and this appeal followed.
Raising seven issues, Brewer contends the trial court abused its discretion by: (1) awarding sanctions for conducting a survey *874 when, as a matter of law, the conduct of a survey or poll to test "actual or hypothetical messages and themes in connection with a potential or pending case" is not a bad faith abuse of the judicial process; (2) basing a bad-faith-finding on mere gross negligence; (3) concluding, as a matter of law or fact, that he acted in bad faith; (4) imposing sanctions without a finding that the survey "significantly interfered" with the court's legitimate exercise of a traditional core function (or, alternatively, that the survey significantly interfered with the parties' rights to a trial by jury); (5) imposing sanctions that were more severe than necessary and just; (6) failing to consider an affidavit tendered; and, (7) denying his motion for continuance. Appellees and various amicus curie contend the trial court did not abuse its discretion and the imposition of sanctions was necessary to preserve, protect, and "hold inviolate" the right to trial by jury. An amicus curie brief was also filed in support of Brewer's contention that the survey in question was not a "push poll."[5]
ANALYSIS
Generally, Brewer contends there was no evidence to support the required legal standard of intentional misconduct and that there was no evidence showing that, at the time of the survey, he acted with any bad faith or mens rea , as required by law. He further contends that lawyers cannot and should not be afraid to represent their clients zealously and that the sanctions order against him has a chilling effect on that duty. Appellees respond by arguing that the sanctions order is justified by the record and by the circumstances surrounding Brewer's participation in the telephone survey in question.
STANDARD OF REVIEW
A trial court has the inherent power to impose sanctions against an attorney and that power is derived, in part, from Article II of the Texas Constitution. TEX. CONST . art. II, § 1 (recognizing that each branch of government-Legislative, Executive, and Judicial-has certain powers "properly attached" to that branch). In that regard, it has long been held that a trial court has the "inherent power" to sanction bad faith conduct of an attorney committed during the course of pending litigation that interferes with the effective administration of justice or the preservation of the court's dignity and integrity. Eichelberger v. Eichelberger , 582 S.W.2d 395, 398 (Tex. 1979) ; Onwuteaka v. Gill , 908 S.W.2d 276, 280 (Tex. App.-Houston [1st Dist.] 1995, no writ). As the Texas Supreme Court noted in Public Utility Com. v. Cofer , 754 S.W.2d 121, 124 (Tex. 1988), "[w]e can say without hesitation that in our adversary system, a court has not only the power but the duty to insure that judicial proceedings remain truly adversary in nature." (Emphasis in original). Courts may not, however, invoke this inherent power "without some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of its traditional core functions." Howell v. Tex. Workers' Comp. Comm'n , 143 S.W.3d 416, 447 (Tex. App.-Austin 2004, pet. denied) (citing Kennedy v. Kennedy , 125 S.W.3d 14, 19 (Tex. App.-Austin 2002, pet. denied) ). Therefore, the court's "inherent power to sanction exists only to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process" affecting a core function of the court. Onwuteaka , 908 S.W.2d at 280.
*875 In applying that standard, an appellate court reviews a trial court's imposition of sanctions under an abuse of discretion standard. See Cire v. Cummings , 134 S.W.3d 835, 838-39 (Tex. 2004) (reinstating the trial court's sanctions order, finding that order was not an abuse of discretion); In re Bennett , 960 S.W.2d 35, 40 (Tex. 1997) (same). See also Low v. Henry , 221 S.W.3d 609, 621-22 (Tex. 2007) (affirming the trial court's imposition of sanctions pursuant to section 10.001(3) of the Texas Civil Practice and Remedies Code but finding an abuse of discretion in not more specifically identifying a sufficient basis to support the amount of sanctions); Lawrence v. Kohl , 853 S.W.2d 697, 700-01 (Tex. App.-Houston [1st Dist.] 1993, no writ) (finding imposition of sanctions to be neither arbitrary or unreasonable in light of the circumstances). Under this standard, a trial court does not abuse its discretion in levying sanctions if some evidence supports its decision. Unifund CCR Partners v. Villa , 299 S.W.3d 92, 97 (Tex. 2009).
Under an abuse of discretion standard, "an appellate court may reverse the trial court's ruling only if the trial court acted without reference to any guiding rules and principles, such that its ruling is arbitrary and unreasonable." Low , 221 S.W.3d at 614 (citing Cire , 134 S.W.3d at 838-39 ); Am. Flood Research, Inc. v. Jones , 192 S.W.3d 581, 583 (Tex. 2006) ; Downer v. Aquamarine Operators, Inc. 701 S.W.2d 238, 241-42 (Tex. 1985). In deciding whether the trial court abused its discretion, we are cautioned to "bear in mind that the mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." City of Dallas v. Ormsby , 904 S.W.2d 707, 710 (Tex. App.-Amarillo 1995, writ denied).
When evaluating the propriety of a sanctions order, an appellate court must also remain mindful that a sanctions order involves two separate judicial decisions: (1) whether to impose a sanction and (2) what sanction to impose. TransAmerican Nat'l Gas Corp. v. Powell , 811 S.W.2d 913, 917 (Tex. 1991). Therefore, in conducting our review of a sanctions order, we must conduct a two-part analysis by determining whether: (1) there is a direct relationship between the offensive conduct and the sanction imposed and (2) the sanction imposed is reasonable and not excessive. Id.
In other words, any sanction imposed should be directly related to offensive conduct, be no more severe than required to satisfy legitimate purposes, and the "punishment should fit the crime." Chrysler Corp. v. Blackmon , 841 S.W.2d 844, 849 (Tex. 1992). This means that a trial court must consider less stringent sanctions first to determine whether lesser sanctions will fully promote compliance, deterrence, and discourage further abuse. Id. ; In re J.V.G. , No. 09-06-00015-CV, 2007 Tex. App. LEXIS 5426, at *11 (Tex. App.-Beaumont July 12, 2007, no pet.) (mem. op.) (holding that "the fact that sanctionable conduct does not bear the label ... of having 'interfered with the core functions of the trial court,' does not indicate an abuse of discretion so long as the record indicates a direct relationship between the improper conduct and the sanction imposed, and that a lesser sanction would have been insufficient to serve its punitive function").
Findings of fact and conclusions of law from a sanctions hearing are not the same as those contemplated by Rules 296 and 297 of the Rules of Civil Procedure ; United States Fidelity & Guaranty Co. v. Rossa , 830 S.W.2d 668, 672 (Tex. App.-Waco 1992, writ denied), *876 and such findings should not be given the same weight as findings made under those rules. Goff v. Branch, 821 S.W.2d 732, 738 (Tex. App.-San Antonio 1992, writ denied). During an appellate review, the entire record, including the evidence, arguments of counsel, written discovery on file, and the circumstances surrounding the party's sanctionable conduct, must be examined. Rossa, 830 S.W.2d at 672 ; Abcon Paving, Inc. v. Crissup, 820 S.W.2d 951, 954 (Tex. App.-Fort Worth 1991, no writ). Thus, we are not limited solely to a review of the "sufficiency of the evidence" to support the findings made or implied; rather, we make an independent inquiry of the entire record to determine whether the court abused its discretion in imposing the sanction in question. See Rossa , 830 S.W.2d at 672. See also Otis Elevator v. Parmelee, 850 S.W.2d 179, 181 (Tex. 1993) ; Chrysler Corp., 841 S.W.2d at 852-53.
ISSUE ONE-SURVEYS ARE NOT A BAD FAITH ABUSE OF JUDICIAL PROCESS
By his first issue, Brewer contends the trial court abused its discretion by sanctioning him because the use of a pretrial survey is not a "bad faith" abuse of the judicial process since "[t]here is no rule, ethics opinion, case, disciplinary rule, or other authority that prohibits the type of survey conducted in this case." He posits that because the use of surveys is not specifically prohibited, such surveys can be ethically administered, and their use is common, or at least generally accepted, rendering the trial court's imposition of sanctions ipso facto an abuse of discretion. Brewer contends that the absence of express authority directly prohibiting this conduct operates as implied permission to conduct such surveys. This is a logical fallacy. Such an argument fails to account for the inherent power of the trial court to oversee the trial of a cause of action or the interplay of the rules of professional conduct and ethics on unforeseen efforts to impact the outcome of a trial or to influence a witness. In that regard, Texas appellate courts have consistently held that a trial court has the inherent power to sanction litigants and attorneys whose abusive conduct affects a core function of the judiciary and this power exists regardless of whether the conduct is specifically proscribed by rule or statute. Davis v. Rupe , 307 S.W.3d 528, 530 (Tex. App.-Dallas 2010, no pet.) (decision reached on appeal of a different cause number in Ritchie v. Rupe , 339 S.W.3d 275 (Tex. App.-Dallas 2011), rev'd on other grounds , 443 S.W.3d 856 (Tex. 2014) ).
While, no doubt, pretrial surveys have been generally accepted as a legitimate method for testing actual or hypothetical arguments relating to a pending case,[6] Brewer assumes far too much in his categorical statement that the type of survey conducted in this case is not prohibited, at least inferentially, by case law, statute, or constitutional authority. In support of his argument, Brewer cites three cases: (1)
*877 Primrose Operating Co. v. Jones , 102 S.W.3d 188 (Tex. App.-Amarillo 2002, pet. denied) (involving the use of a mock trial), (2) United States v. Collins , 972 F.2d 1385 (5th Cir. 1992) (involving the use of a telephone survey), and (3) First Heights Bank, FSB v. Gutierrez, 852 S.W.2d 596 (Tex. App.-Corpus Christi 1993, writ denied) (recognizing that pretrial surveys are commonly conducted to support a motion to transfer venue).
In Primrose , this court gave tacit approval to the use of a mock trial conducted shortly before jury selection in a personal injury lawsuit. In that case, the plaintiff's attorney assembled twelve individuals from a small close-knit community with a total population of just over 300 for the purpose of questioning community attitudes regarding various issues to be addressed at trial. The attorney first asked the participants if any of them had been summoned for jury duty in the upcoming case and one person was excluded when he indicated that he had been summoned. The attorney then summarized the evidence he expected each party to present. After the meeting, which lasted approximately two hours, the group opined on the apportionment of responsibility and damages. When the defendant's learned about the meeting, they made a pretrial motion for mistrial on the basis that the mock trial had tainted the entire venire. The trial court did not rule on the motion immediately. Instead, it deferred a ruling pending completion of the voir dire examination. During jury questioning, the effect of the mock trial was thoroughly examined by all parties, and at the conclusion of that phase of the trial, the motion for mistrial was denied. The issue on appeal was whether the trial court erred in denying the motion for mistrial. Under the facts of that case, this court held, "[w]hether [the plaintiff's] attorneys sought to influence members of the venire by communicating with non-members is a fact question for resolution by the trial court." Primrose , 102 S.W.3d at 194. The trial court's decision to deny the motion for mistrial was affirmed because, under the circumstances of that case, it could not be said that the trial court's decision was an abuse of discretion.
Appellant also relies on United States v. Collins to support his argument that a pretrial survey of prospective jurors was permissible per se because it did not compromise the integrity of the jury selection process. In Collins , a federal judge was charged with bribery, obstruction of justice, and conspiracy relating to allegations that a criminal defendant had paid the judge and his associate $100,000 in exchange for a lenient sentence. Prior to trial, the prosecution commissioned a telephone survey of 457 persons in the Eastern District of Louisiana, asking them various questions relating to the upcoming trial. The defendants found out about the survey and reported it to the district court, which in turn ordered the prosecution to cease all polling and to turn over the results of the poll to the court. After reviewing the polling material and the results collected, the court concluded that the integrity of the jury selection process had not been compromised.
Contrary to Brewer's contention, this decision does not stand for the general proposition that "telephone surveys conducted in the trial venue do not endanger the impartiality of a potential jury venire and do not violate due process...." To the contrary, it stands for the proposition that such surveys are subject to review by the presiding court in order to determine whether anything was done to compromise the integrity of the jury selection process. Collins , 972 F.2d at 1398.
Finally, in Gutierrez, the propriety of a pretrial survey conducted for purposes of supporting a change of venue was never in issue. In that case, surveys were conducted *878 in order to gather information supporting a pretrial change of venue. Gutierrez , 852 S.W.2d at 620-21. No allegation was ever made that the survey itself compromised the jury pool or the integrity of the jury selection process. Here again, just because a survey might have been properly used for one purpose in one case does not make the use of all surveys proper in every case ipso facto.
The common denominator in Primrose and Collins is that the appellate court affirmed the trial court's determination that the jury selection process had not been compromised. Neither of those cases involved the propriety of the trial court's decision to impose sanctions for such pretrial conduct. Here, however, we are faced with a situation where the trial court, after reviewing the evidence, came to the distinct conclusion that the survey had been a conscious attempt by the surveying party to influence the jury pool-a finding patently missing in both Primrose and Collins.
It should be noted that Judge Reyes, in issuing his letter ruling, specifically stated that he was "not commenting on the broader issue of lawyers utilizing polling, focus groups or mock trials...." The sanctions order entered in this case speaks only to the survey used in this particular case and the manner of its actual "implementation and utilization" in the case pending before the court. Because the trial court did not base its sanction order on the mere fact that a telephone survey had been used, issue one is overruled.
ISSUES TWO AND THREE-BAD FAITH REQUIREMENT FOR SANCTIONS
By his second issue, Brewer contends the trial court erred by basing its "bad faith" finding on mere gross negligence; and, by his third issue he contends the trial court erred by concluding that he acted in bad faith.
"Trial courts have inherent power to impose sanctions for bad faith abuse of the judicial process even when the targeted conduct is not expressly covered by a rule or statute." Ezeoke v. Tracy , 349 S.W.3d 679, 685 (Tex. App.-Houston [14th Dist.] 2011, no pet.) (citing Eichelberger , 582 S.W.2d at 398 ). This inherent power exists to the extent necessary to deter, alleviate, and counteract the bad faith abuse of the judicial process, such as interference with the traditional core functions of the court. Ezeoke , 349 S.W.3d at 685 (citing McWhorter v. Sheller , 993 S.W.2d 781, 788-89 (Tex. App.-Houston [14th Dist.] 1999, pet. denied) ).
For a trial court to exercise its inherent power to sanction an attorney, the offending conduct must have been an intentional act committed in bad faith-mere negligence, inadvertence, or poor judgment is not enough. See McWhorter , 993 S.W.2d at 789. See also Onwuteaka , 908 S.W.2d at 280 (reversing sanctions order where the evidence supported a finding that the offending conduct might have been negligent but not supporting a finding of bad faith). A court's "inherent power to sanction exists only to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as the significant interference with core judicial functions...." Id. "An attorney who makes a reasonable decision in the handling of a case may not be held liable if the decision later proves to be imperfect." Cosgrove v. Grimes , 774 S.W.2d 662, 664-65 (Tex. 1989) (stating that the appropriate standard in a legal malpractice case is the "objective exercise of professional judgment" based on a "reasonably prudent attorney," not a subjective standard; disapproving cases recognizing an exception to attorney negligence based on the "subjective good faith of an attorney").
Therefore, even in the absence of applicable case law, statute, or constitutional *879 provision prohibiting the use of pretrial telephone surveys, a court has the inherent authority to sanction a party, or his attorney, for the bad faith use of such a survey if it finds that to do so will aid in the exercise of its jurisdiction, the administration of justice, the preservation of judicial independence, or the integrity of the judicial process. See In re Bennett , 960 S.W.2d at 40 (citing Eichelberger , 582 S.W.2d at 398 ); Onwuteaka , 908 S.W.2d at 280. See also Howell , 143 S.W.3d at 451 (affirming the imposition of sanctions under Rule 13 of the Texas Rules of Civil Procedure but reversing for recalculation). A trial court's inherent power to neutralize inappropriate conduct exists to the extent, and only to the extent, that it is "necessary to deter, alleviate, and counteract the bad faith abuse of the judicial process." See Howell , 143 S.W.3d at 446-47. See also In re Bennett, 960 S.W.2d at 40 (finding same); In the Estate of Perez-Muzza , 446 S.W.3d 415, 424 (Tex. App.-San Antonio 2014, pet. denied).
In arguing that he did not act in bad faith, Brewer relies heavily on this court's decision in Foust v. Hefner , No. 07-13-00331-CV, 2014 WL 3928781, at *2, 2014 Tex. App. LEXIS 8880 at *5 (Tex. App.-Amarillo Aug. 12, 2014, no pet.) (mem. op.), for the proposition that sanctions require a finding of "bad faith" and a finding of "bad faith" must include the appropriate mens rea of the accused. Brewer contends, and we agree, that bad faith is not simply bad judgment or negligence but rather the "conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose." Pearson v. Stewart , 314 S.W.3d 242, 248 (Tex. App.-Fort Worth 2010, no pet.). Accordingly, he contends that bad faith requires proof of a culpable mental state. Notwithstanding what Brewer would like Foust to say, our previous opinion should not be read as requiring direct proof of a temporal mens rea.
In Foust, sanctions were sought pursuant to section 10.001 of the Texas Civil Practice and Remedies Code for the bad faith assertion of a claim. TEX. CIV. PRAC. & REM. CODE ANN . § 10.001 (West 2017). There, the trial court did not conduct a separate evidentiary hearing on the motions for sanctions before levying the sanctions imposed. Foust , 2014 WL 3928781, at *2-3, 2014 Tex. App. LEXIS 8880, at *6. After noting that a presumption of good faith existed and that it was the movant's burden to rebut that presumption, this court merely held that the movant's burden of proof had not been met. Id. at *1-2, 2014 Tex. App. LEXIS 8880, at *3. Requiring a sufficient showing to rebut a presumption of good faith is not the legal equivalent of requiring a showing of bad faith. Therefore, while Foust does support the general proposition that an order of sanctions must be supported by some evidence of bad faith, it is of little, persuasive weight concerning the level of proof necessary to establish bad faith.
As stated above, bad faith requires proof of "conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose." See id. at *5, 2014 Tex. App. LEXIS 8880, at *12. A court's inherent power does not allow an attorney to be sanctioned for "simply bad judgment or negligence...." Pearson , 314 S.W.3d at 248 (holding that an "[i]mproper motive is an essential element of bad faith").
Here, Brewer contends no bad faith was shown because the evidence established that no specific people were targeted in connection with the survey. Brewer testified that he did not intend for anyone connected to the case to be contacted and that he regretted the fact that some were.[7] According to his argument, *880 because there was no specific intent to improperly contact anyone connected with the case, including potential members of the venire panel, there was no nexus between his conduct and the sanctions issued by the trial court. Brewer ignores the fact that, in Judge Reyes's lengthy letter ruling of January 22, 2016, the trial court found that:
• Brewer responded to the sanctions motions and allegations with a demeanor that was "nonchalant and uncaring."
• Brewer was "repeatedly evasive in answering questions" requiring the court to sustain numerous objections for non-responsiveness.
• Brewer testified that he was responsible for the overall operations of Bickel & Brewer and that he reviewed and approved all the poll questions-several of which the court found were "designed to influence or alter the opinion or attitude of the person being polled."
• Brewer's actions were "not merely a negligent act, a mistake or the result of poor judgment" and his attempt to avoid responsibility for his conduct was "in bad faith, unprofessional and unethical."
• Brewer's conduct falls in the category of misconduct which is "highly prejudicial and inimical to a fair trial by an impartial jury."
• Brewer's conduct was "disrespectful to the judicial system," "threatening to the integrity of the judicial system," and incompatible with a "fair trial by an impartial jury."
• Brewer's conduct, "taken in its entirety, is an abusive litigation practice that harms the integrity of the justice system and the jury trial process."
• Brewer's conduct was "designed to improperly influence a jury pool" via the dissemination of information "without regard to its truthfulness or accuracy."
• The "net effect of Brewer's conduct was to impact the rights of parties to a trial by an impartial jury of their peers."
• Brewer's conduct "negatively affected the due process and seventh (7th) amendment protection due to litigants in the case before the Court."
• Brewer's conduct was "intentional and in bad faith and abusive of the legal system and the judicial process specifically."
Brewer further contends no bad faith was shown because the conduct in question did not violate a rule, statute, or ethical code of conduct. In that regard, Brewer should be reminded that sanctionable conduct need not necessarily be an ethical violation. See Golden Eagle Distrib. Corp. v. Burroughs Corp. , 801 F.2d 1531, 1538-39 (9th Cir. 1986).
Brewer also contends the sanctions were improper because any adverse impact on the venire panel occasioned by the inadvertent contact of a member of that panel could be remedied by effective voir dire. Brewer's voir dire argument begs the question. The mere fact that a subsequent voir dire might ameliorate the adverse effect of his improper conduct in no way negates the existence of bad faith. An available means of recompense does not justify or excuse misconduct.
*881 It is undisputed that a trial court's ability to empanel an impartial jury and try a case before unintimidated witnesses are core functions of the court. Here, the trial court perceived Brewer's "intentional and bad faith" conduct in connection with the telephone survey as threatening either or both of these core functions. Based on the record before us, we are unable to state that the trial court's conclusions amounted to an abuse of discretion. Issues two and three are overruled.
ISSUE FOUR-SIGNIFICANT INTERFERENCE WITH TRADITIONAL CORE FUNCTION
A trial court cannot exercise its inherent power to sanction a party, or its attorney, without some evidence and a factual finding that the complained-of-conduct "significantly interfered" with the court's legitimate exercise of one of its traditional core functions. See Howell , 143 S.W.3d at 447 ; McWhorter , 993 S.W.2d at 789 (reversing imposition of sanctions pursuant to inherent powers when no such finding was made). See also Ezeoke , 349 S.W.3d at 685 (reversing sanctions against an attorney based on the trial court's inherent power where the complained-of-conduct did not interfere with the exercise of a core function). The core functions subject to protection by the inherent power of a trial court to sanction an attorney encompass "hearing evidence, deciding issues of fact raised by the pleadings, [and] deciding questions of law...." Trevino v. Ortega , 969 S.W.2d 950, 958 (Tex. 1998) (Baker, J. concurring) (quoting Kutch v. Del Mar College , 831 S.W.2d 506, 510 (Tex. App.-Corpus Christi 1992, no writ) ). Under this standard, it goes without saying that empaneling a fair and impartial jury, untainted by outside influences, is a "traditional core function" of the trial court. Likewise, receiving evidence from witnesses unthreatened by any outside influence is a "traditional core function" of the trial court.
By his fourth issue, Brewer maintains the trial court erred by imposing sanctions without a finding that the survey in question "significantly interfered" with the court's legitimate exercise of a traditional core function (or alternatively, that the survey significantly interfered with the parties' rights to a trial by jury).
Brewer contends the "record is devoid of any evidence that the survey interfered with any function of the court." Specifically, he argues that because the underlying case settled before a jury venire was summoned, there is "no evidence that any jury member or even any venire member was contacted in connection with the jury survey." While acknowledging that the database of potential surveyees included "court personnel, their spouses, City Council and their spouses, City Managers, witnesses and their spouses, designated third-parties and their spouses," Brewer suggests there is no evidence of any "likelihood of interference or influence with the potential jury pool" because there is no evidence that "any of these individuals completed the survey, and none of them would have served as jurors, in any event." According to Brewer's line of logic, his actions could not have significantly interfered with a core function of the trial court because "voir dire would have cured any potential interference," thereby rendering the trial court's sanctions improper. According to Brewer's reasoning, voir dire would have allowed the trial court and the parties to determine whether the survey had a significant impact on potential jurors-and, if so, to simply strike those jurors. By this logic, it would be permissible to improperly influence a jury panel so long as we have a competent set of attorneys and a diligent trial judge willing to parse through the venire and eliminate any potential bias injected into the jury by that improper influence. That is not the way our judicial system works. Litigants should *882 enter the courtroom on an equal basis, not one made equal by the hard work of conducting voir dire on a biased panel. "The law is exceedingly jealous of the purity of the jury box , and always has been. It seeks to shut up every avenue through which corruption ... or any other improper influence, could possibly make an approach to it." Pierson v. State , 18 Tex. App. 524, 559 (1885) (Emphasis added).
While the words "significantly interfered" were not used by the trial court in its order of sanctions, under this record, we cannot say the trial judge abused his discretion by implicitly determining that the survey in question "significantly interfered" with the court's legitimate exercise of a traditional core function. Issue four is overruled.
ISSUE FIVE-IMPOSITION OF EXCESSIVE SANCTIONS
By his fifth issue, Brewer contends the trial court erred by imposing sanctions that were more severe than necessary and just. Repeating his argument that voir dire could have cured any improper influence, Brewer contends that "voir dire-not sanctions-was the appropriate remedy.... Thus, the trial court abused its discretion by imposing sanctions...."
Sanctions exist, in part, to insure that attorneys place principles above personalities and to remind them that service to their clients must coexist with their responsibilities to the court, to the law, and to the entire judicial system. United States v. Thomas , 484 F.2d 909, 913 (6th Cir. 1973). "To determine if the sanctions were appropriate or just, an appellate court must ensure there is a direct nexus between the improper conduct and the sanction imposed." Low, 221 S.W.3d at 614 (citing Spohn Hosp. v. Mayer , 104 S.W.3d 878, 882 (Tex. 2003) and TransAmerican , 811 S.W.2d at 917 ). Generally, a sanction cannot be excessive, nor should it be assessed without appropriate guidelines. Low , 221 S.W.3d at 620. In that regard, the sanction imposed must relate directly to the abuse found and "be no more severe than necessary to satisfy its legitimate purpose." Id. (quoting TransAmerican , 811 S.W.2d at 917 ). Ultimately, an appropriate sanction is limited by the trial court's duty to exercise sound discretion. Low , 221 S.W.3d at 619.
"In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion." Am. Flood Research, Inc., 192 S.W.3d at 583 (citing Chrysler Corp. , 841 S.W.2d at 852 ). Therefore, as stated above, when evaluating the appropriateness of a sanction, an appellate court should engage in a two-step process to determine whether: (1) a nexus exists between the improper conduct and the sanction imposed and (2) the sanction is necessary and appropriate to remedy the injury caused by that conduct. TransAmerican , 811 S.W.2d at 917. The nexus requirement ensures that the sanction is appropriately directed against the abuse and toward remedying the damage or prejudice caused to the innocent party. Id.
Although the Texas Supreme Court has not specifically identified the factors a trial court should consider when assessing a sanction under its inherent powers, we find significant guidance from cases involving the imposition of sanctions under Rule 215.3 of the Texas Rules of Civil Procedure. For example, in Cire , the Supreme Court stated that a trial court should clearly indicate that it considered lesser sanctions before imposing severe, "death penalty" sanctions for deliberately violating the trial court's orders concerning the preservation of certain evidence. 134 S.W.3d at 842. Other factors clearly include *883 the costs and fees incurred by the parties as a result of the offensive conduct. Low , 221 S.W.3d at 621.
In evaluating the appropriateness of any sanction imposed, this court must consider the nature of the wrong and the options available to remedy the wrong. In Davis v. Rupe, 307 S.W.3d at 531-35, the Dallas Court of Appeals affirmed the imposition of a $15,000 sanctions award for misleading statements and misrepresentations made to the trial court by the attorney being sanctioned.
Here, the trial court concluded that credible evidence supported not only the imposition of monetary sanctions but also the imposition of additional professional ethics hours. Significant to the issue of the appropriateness of the sanctions imposed, the trial court found the survey in question was like a push poll, intended to influence the views and opinions of potential venire, and the evidentiary record supports that conclusion. Expert testimony was provided that identified a "push poll" as a survey "done in the guise of information gathering, but truthfully done to try to sway or persuade, to effect attitude change." As such, push polls are characterized by an intentional attempt to create attitude changes by providing previously unknown information, without regard to the accuracy of that information. Their most common use is in the arena of political campaigns, where the accuracy of information is often seen as being relative to the political objective of the person or entity commissioning the survey.
Here, the trial court found that several questions in the survey were intended to comment on the pending lawsuit and to "influence or alter" public opinion in favor of the interests of Brewer's client, Titeflex.[8] It further determined that Brewer's participation in that survey was not merely incidental or negligent and that his contention that he bore "clean hands" because the poll was purportedly a blind study was "insulting" to the court. The trial court also considered as a relevant factor the threat that the practice of conducting such polls posed to the "integrity of the judicial system" and the need to curtail and discourage such practices. Furthermore, the trial court found that Brewer's conduct was "abusive," "highly prejudicial," and done "without regard to its truthfulness or accuracy." Because those practices negatively affected the right of the parties to a fair and impartial jury, negatively reflected upon the integrity of the judicial system, was counter to the principles of due process and substantive justice, and was committed in bad faith and with the intent to obtain an unfair advantage, we cannot say the trial court abused its discretion in finding a nexus between the improper conduct and the sanction imposed. Accordingly, a breakdown of the first step in the TransAmerican two-step analysis supports the imposition of sanctions.
The second step in that analysis is whether the sanction imposed was necessary and appropriate to remedy the injury caused by that conduct. Here, the trial court's letter ruling ordered that Appellees recover from Brewer fees and expenses totaling $133,415.27, plus contingent fees and expenses totaling $43,590.00.[9] While the dollar amount of that sanction is substantial, *884 we must conduct our analysis in the context of the litigation at issue. This was not a simple tort case involving one plaintiff and one defendant. It was a products liability/wrongful death case, with multiple parties, and with potential ramifications in other litigation involving the same product. The issues were hotly contested, and the stakes were high. The trial court received and reviewed hundreds of pages of itemized billing records from the attorneys involved which support the dollar amount of the fees awarded and it was in the best position to make weight and credibility determinations concerning the "reasonableness" of the fees themselves.
Furthermore, not only did the trial court find the survey violated applicable standards of professional conduct and substantially interfered with its core functions, it also found that, during the sanctions hearings, Brewer was dismissive and uncaring. In light of the clear intent of the proceedings being an accounting for the questionable pretrial conduct at issue, it is not unreasonable to assume the trial court considered Brewer's attitude and demeanor as being particularly offensive when evaluating the appropriateness of the sanctions.
Therefore, under this record, we cannot say that the amount of the sanctions imposed was unnecessary or inappropriate. Accordingly, issue five is overruled.
ISSUES SIX AND SEVEN-FAILING TO CONSIDER AN AFFIDAVIT AND DENYING BREWER'S MOTION FOR CONTINUANCE.
Brewer's final two issues center around his perceived denial of the opportunity to present the testimony of the third-party vendor who performed the survey in question. Brewer contends the trial court erred (1) by denying his motion for continuance-which would have allowed him time to depose individuals associated with the development and implementation of the survey in question, such as representatives of Public Opinion Strategies and SSI, and to locate experts on the issue of the use of pretrial surveys and (2) by refusing to consider SSI's affidavit which was attached to Brewer's response to the pending motions for sanctions.
Brewer contends that after he was replaced as counsel for Titeflex, his law firm was no longer receiving filings and notices and the movants set the sanctions hearing without consulting him or providing timely notice. As a result, Brewer moved for a continuance, seeking additional time to engage in discovery relevant to his opposition to the sanctions motions.[10] On September 18, 2014, without a hearing, the trial court denied the motion for continuance.
Being unable to conduct discovery as he had hoped, Brewer sought and obtained the affidavit of Jacob Flake, an SSI employee, which he attached to his response to the motions for sanctions. See TEX. R. CIV. P. 215.6 (providing that a response to a motion for sanctions "may have exhibits attached including affidavits, discovery pleadings, or any other documents"). Brewer contends the affidavit supports his argument that he did not act in bad faith because it would have established that no one in Brewer's office played any part in making the decision as to which phone numbers to call. He further argues the trial court erred because it refused to consider Flake's affidavit for the reason that it viewed that affidavit as hearsay.
Appellees respond by contending the motion for continuance filed by Bickel *885 & Brewer was not supported by an affidavit as required by Rule 252 of the Texas Rules of Civil Procedure. See TEX. R. CIV. P. 252 (providing that a motion for continuance based on a want of testimony must be supported by an affidavit showing the materiality of the testimony). See also TEX. R. APP. P. 33.1(a)(1)(B) (providing that, in order to preserve a complaint for appellate review, a motion for continuance must comply with the requirements of the Texas Rules of Civil Procedure). Appellees point to the fact that the motion for continuance was accompanied by a verification (rather than an affidavit) signed by James R. Renard on behalf of Bickel & Brewer. In relevant part, the verification states that the facts set forth in the motion for continuance are "true and correct based upon his personal knowledge and reasonable inquiry."
In order to qualify as an "affidavit" the averment must positively and unequivocally specify that the facts disclosed are true and within the affiant's personal knowledge. Rodriquez v. Texas Farmers Ins. Co. , 903 S.W.2d 499, 507 (Tex. App.-Amarillo 1995, writ denied) (holding the trial court did not err in refusing to consider an affidavit that did not contain an averment of truth of the facts stated). Here, the sworn statement of Mr. Renard states, on its face, that the "facts set forth in the foregoing Motion To Continue Sanctions Hearing ... are true and correct based upon his personal knowledge and reasonable inquiry." Because Appellees fail to otherwise specify how Renard's "verification" does not satisfy the requirements of an affidavit, we reject this argument-finding, instead, that the motion was properly supported.
More persuasively, Appellees respond by contending that even if the Bickel & Brewer motion for continuance could be construed as a motion filed on behalf of Brewer, individually; and even if the verification could be construed as satisfying the requirements of a Rule 252 affidavit; and even if the denial of the motion for continuance were then found to be an abuse of discretion, and even if the Flake affidavit was improperly disregarded, there still would not be any reversible error because that error did not cause the rendition of an improper judgment. See TEX. R. APP. P. 44.1 (providing that no judgment may be reversed on appeal on the ground the trial court made an error of law unless the court of appeals concludes the error probably caused the rendition of an improper judgment).
Here, Brewer posits that a continuance would have allowed for the discovery of additional evidence supporting his argument that he did not act in bad faith. This argument is, however, of little moment where Brewer was afforded a full opportunity to call witnesses and present testimony supporting his claim of good faith. Because additional time was not necessary for Brewer to present evidence of his good faith, error, if any, in denying his motion for continuance was harmless. Issues six and seven are overruled.
CONCLUSION
If the right to a civil jury trial, enshrined in both the Seventh Amendment to the United States Constitution and Article I of the Texas Constitution, is going to signify anything at all, it must denote the right to trial by a fair and impartial jury. Any conduct that erodes that fundamental core principle erodes public confidence in the entire judicial process. Judges, attorneys, and litigants must never condone practices that undermine that principle if the right to a jury trial is to remain "inviolate."
Here, the trial judge was faced with serious allegations that attorneys for one party had consciously attempted to preemptively tip the balance of a fair and *886 impartial jury in favor of their clients. After diligently hearing testimony for several days, the Honorable Ruben G. Reyes reached the conclusion that counsel's conduct was committed in bad faith, that it affected a core function of the court, and that it was sanctionable. He then set the monetary amount of those sanctions in a rational manner based on competent evidence before him. Under the record before this court, we cannot say the trial judge abused his discretion in imposing those sanctions. Accordingly, the judgment of the trial court is affirmed.
Appendix A
Appendix A LUBBOCK, TEXAS Interview Schedule Field Dates: May 21-22, 2014 N=300 Homeowners Project#: 14381 Margin of Error = ±5.66% ---------------------------------------------------------------------------------------------------------------- Hello, I'm _____________ of ______________ Research, a national research firm. We're talking with people in your area and would like to ask you a few questions on a confidential basis. We are not attempting to sell anything, nor will your participation result in any calls in the future to sell you anything. (DO NOT PAUSE) ---------------------------------------------------------------------------------------------------------------- (ASK CP1-CP4 QUESTIONS TO CELL SAMPLE ONLY) ---------------------------------------------------------------------------------------------------------------- CP1. For your safety, are you currently driving? ---------------------------------------------------------------------------------------------------------------- CP2. In which state do you currently live? (If not TEXAS THANK AND TERMINATE) ---------------------------------------------------------------------------------------------------------------- CP4. Of all the personal telephone calls that you receive, do you get ... (READ, ROTATE PUNCHES 1 AND 3 - KEEP 2 ALWAYS IN THE MIDDLE)? ---------------------------------------------------------------------------------------------------------------- First, just a few questions about you to make sure we have a representative sample ... A. And, do you own or rent your home? (IF OWN, ASK:) And, do you want to move sometime in the next few years? ---------------------------------------------------------------------------------------------------------------- B. And, just to be sure we have a representative sample ... In what year were you born? ---------------------------------------------------------------------------------------------------------------- 1. Would you say that things in Lubbock are going in the right direction, or have they pretty seriously gotten off on the wrong track? ---------------------------------------------------------------------------------------------------------------- Thinking about a different topic ... How likely is it that any of the following weather related events would damage homes in your area? (RANDOMIZE) VERY SMWT NOT VERY NOT AT ALL DK REF LIKELY LIKELY LIKELY LIKELY (DNR) (DNR) 2. Tornado 3. Flood 4. Lightning ---------------------------------------------------------------------------------------------------------------- *887 5. Thinking now just about lightning, if lightning were to actually strike your home, would the damage to that home be (ROTATE TOP TO BOTTOM, BOTTOM TO TOP) ... VERY SIGNIFICANT SOMEWHAT SIGNIFICANT NOT VERY SIGNIFICANT NOT AT ALL SIGNIFICANT DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) TOTAL SIGNIFICANT TOTAL NOT SIGNIFICANT ---------------------------------------------------------------------------------------------------------------- 6. Thinking some more about your house, who would you say is MOST responsible for ensuring that your home is safely constructed. Is it ... (RANDOMIZE) THE HOME BUILDER MANUFACTURERS OF THE BUILDING MATERIALS IN THE HOME HOME INSPECTORS HOMEOWNER OTHER (SPECIFY ____________) ALL OF THE ABOVE DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 7. Thinking now about your home, do you use natural gas in your home? YES, USE NATURAL GAS NO, DO NOT USE NATURAL GAS DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- (IF Q7:1, ASK) 8. And, is the natural gas in your home transported by Corrugated Stainless Steel Tubing, also known as CSST, or is it transported by black iron pipe? CSST Black iron pipe Other (SPECIFY) (__________) Neither (DO NOT READ) Don't Know/Not Sure (DO NOT READ) Refused (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- Changing topics slightly ... *888 9. As you may know, a lightning strike can damage materials in your home, including the CSST used to transport natural gas. In some instances where the CSST is not installed in accordance with the manufacturer's instructions, damage to CSST following a lighting [sic] strike can result in the escape of natural gas, which can cause a house fire. If this happened at your home, who would you say is MOST to blame? (RANDOMIZE) The manufacturer who makes and sells the natural gas piping The installer, who might have installed the material improperly The homebuilder, who hires the installers of the natural gas piping No one, because a lightning strike is a natural disaster DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) TOTAL INSTALLER/HOMEBUILDER ---------------------------------------------------------------------------------------------------------------- 10. And, have you seen, read, or heard anything about the potential dangers of CSST? YES NO DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- (If Q10:1, ASK) 11. And, what was. the source of this information? (DO NOT READ) (ACCEPT MULTIPLE RESPONSES) TV RADIO MAIL NEWSPAPER FRIENDS/NEIGHBORS/FAMILY INTERNET/E-MAIL OTHER (Specify: _____________) DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 12. And, have you seen, read, or heard anything recently about lightning striking a home in Lubbock in August 2012, resulting in a house fire that killed a man who was visiting the home at the time? YES NO DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- (If Q12:1, ASK) 13. And, what was the source of this information? (DO NOT READ) (ACCEPT MULTIPLE RESPONSES) *889 TV RADIO MAIL NEWSPAPER FRIENDS/NEIGHBORS/FAMILY INTERNET/E-MAIL OTHER (Specify: ___________) DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 14. As you may know, in August of 2012, lightning struck a home in Lubbock during a thunderstorm the lightning caused a fire that killed a man who was visiting the home at the time. Fire officials ruled that the fire was caused by a type of natural gas piping called Corrugated Stainless Steel Tubing, or CSST. I would like to read you two statements about who should be responsible for the fire. After I read each one, please tell me which comes closest to your own opinion. (SOME/OTHER) People say that the homebuilder who built the house should be responsible for the incident. They say that if the CSST had been properly installed, it would not have been damaged during the lightning strike, and thus, no fire would have occurred. They say the homebuilder or installer did not make sure that there was a reasonable amount of space between the piping and other electrical wires, as is called for in the manufacturer's installation guidelines. They say that even if the CSST suffered damage which allowed gas to escape, it is unfair for the manufacturer of a product to be held responsible for the improper installation of that product. ... while ... (OTHER/SOME) People say that the manufacturer of the CSST should be responsible for what happened and should not be selling CSST if there is any chance it might fail in a lightning strike. They say the company should not be selling that product, particularly if it knows there is a likelihood it might fail if not properly installed. The ultimate responsibility for product safety rests with a manufacturer. DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 15. As a result of the fire, the homeowners have filed a lawsuit. I am going to read you four options of who the homeowners should sue. After I read each one, please tell me which comes closest to your own opinion. (RANDOMIZE) The homeowners should sue the homebuilder but NOT the manufacturer of the CSST. The homeowners should sue the manufacturer of the CSST but NOT the homebuilder. The homeowners should sue BOTH the homebuilder AND the manufacturer of the CSST. The homeowners should not be suing anyone. DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- (IF Q15:1-4, ASK) 16. And what are some of the reasons you think that (INSERT Q15 CHOICE)? (PROBE:) What else can you tell me about that? Anything else? *890 (ROTATE Q17-25 AND Q26-33) Now I am going to read you several statements about why the manufacturer of the corrugated stainless steel tubing, also known as CSST SHOULD NOT be held responsible. After I read each one, please tell me how convincing that statement is to you. Is it ... very convincing, somewhat convincing, not very convincing, or not at all convincing? (RANDOMIZE) 17. CSST is approved by the American Gas Association and bas been on the market since 1990. CSST is installed in millions of homes across the nation and more than 600,000 homes in Texas, but this is the first time this manufacturer has ever been sued in a wrongful death case. 18. There are clear warnings on the packaging of CSST that, in order to be safe in a lightning storm, the piping must be installed according to the manufacturer's Design & Installation Guide. It is not the fault of the manufacturer that these warnings were not followed in this instance. 19. The manufacturer of CSST partners with the National Association of State Fire Marshals on an awareness campaign about this type of piping that helps make sure people know if they have the product in their home and to see if it was properly installed. 20. The homebuilder did a sloppy job of supervising the contractor he hired to install the electrical wiring and the electrician did not allow for a reasonable amount of space between the electrical wiring and the CSST. The manufacturer cannot be held responsible for this type of sloppy and careless oversight. 21. CSST was developed as a safer alternative to black iron pipe. It has fewer joints, which means there are less places where it can potentially leak. It is also flexible and able to withstand earthquakes or foundation shifts. 22. Many states recognize that CSST is very safe. For example, after a thorough scientific-investigation, the state of Massachusetts lifted a ban on CSST. 23. The Texas State Fire Marshall has said he has no doubt that CSST is safer when it is properly installed. 24. No court has EVER ruled that CSST has been responsible for a fire when it is properly installed. 25. There were many other things that contributed to this tragic incident. The foam insulation in the attic was not properly treated, the people who were present did not heed the warnings of the smoke alarm, and electrical wiring was laying right on top of the CSST, which is in violation of the safety warnings and installation guidelines. ---------------------------------------------------------------------------------------------------------------- Now I am going to read you several statements about why the manufacturer of the corrugated stainless steel tubing, also known as CSST SHOULD be held responsible for causing the fire. After I read each one, please tell me how convincing that statement is to you. Is it ... very convincing, somewhat convincing, not very convincing, or not at all convincing? (RANDOMIZE) 26. The manufacturer of CSST has settled hundreds of lawsuits with insurance companies involving the product and lightning fires. 27. Since the 2012 fire and death, the Lubbock Fire Marshal has banned the use of CSST in new home construction. 28. The manufacturer of CSST makes another gas piping product that it promotes as "lightning resistant." Since it makes a product that may be safer, the manufacturer should not be selling the older, less safe version of the product. *891 29. Texas and more than a dozen other states are identified by the manufacturers as being lighting-prone [sic]. Clearly, the manufacturer should not sell CSST in those states. 30. If the manufacturer is aware that some installers are not installing CSST properly and CSST has the potential to fail in lighting [sic] storms, it should not sell the product in the first place. 31. The manufacturer has a responsibility to ensure CSST is being installed safely. It is not enough to simply entrust that responsibility to the home builder or installer. 32. The manufacturer of CSST has set aside more than one hundred million dollars to fund litigation and settle lawsuits stemming from this product. 33. One of this manufacturer's main competitors quit selling CSST in the United States because the product is unsafe and prone to failure. ---------------------------------------------------------------------------------------------------------------- Now that you have heard some more about this issue ... 34. I am going to again read you four options of who the homeowners should sue. After I read each one, please tell me which comes closest to your own opinion. (RANDOMIZE) The homeowners should sue the homebuilder but NOT the manufacturer of the CSST. The homeowners should sue the manufacturer of the CSST but NOT the homebuilder. The homeowners should sue BOTH the homebuilder AND the manufacturer of the CSST. The homeowners should not be suing anyone. DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 35. And, when lightning hits a house and damages the natural gas piping, causing it to leak gas and resulting in a fire ... who would you say is most at fault. (ROTATE) The manufacturer who makes and sells the CSST The homebuilder who oversees the installation of the CSST ... or ... Neither, because a lightning strike is a natural disaster The installer, who might have installed the material improperly (UNREAD OPTION IN Q35) DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- Now I just have a few more questions for statistical purposes only ... 36. And what is the last grade you completed in school? (DO NOT READ) SOME GRADE SCHOOL (GRADES 1-8) SOME HIGH SCHOOL (GRADES 9-11) GRADUATED HIGH SCHOOL (GRADE 12) TECHNICAL/VOCATIONAL SCHOOL SOME COLLEGE GRADUATED COLLEGE GRADUATE/PROFESSIONALSCHOOL REFUSED *892 HIGH SCHOOL OR LESS SOME COLLEGE COLLEGE+ ---------------------------------------------------------------------------------------------------------------- 37. And in politics today, do you consider yourself ... (ROTATE) a Republican, a Democrat, or something else? ... or are you not registered to vote? (IF REPUBLICAN OR DEMOCRAT, ASK:) Would you call yourself a STRONG (REPUBLICAN/DEMOCRAT) or a NOT-SO-STRONG (REPUBLICAN/DEMOCRAT)? (IF SOMETHING ELSE, ASK:) Do you think of yourself as closer to the Republican or to the Democratic party? STRONG REPUBLICAN NOT-SO-STRONG REPUBLICAN LEAN TO REPUBLICANS SOMETHING ELSE/INDEPENDENT LEAN TO DEMOCRATS NOT-SO-STRONG DEMOCRAT STRONG DEMOCRAT NOT REGISTERED TO VOTE DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) TOTAL REPUBLICAN TOTAL DEMOCRAT ---------------------------------------------------------------------------------------------------------------- 38. And for statistical purposes only ... is your total annual household income greater or less than $60,000 dollars? UNDER $20,000 BETWEEN $20,000-$40,000 OVER $40,000 UNDER $80,000 BETWEEN $80,000-$100,000 OVER $100,000 REFUSED UNDER $40K $40K-$80K OVER $80K ---------------------------------------------------------------------------------------------------------------- *893 39. And, how long have you lived in Lubbock? (DO NOT READ CHOICES) LESS THAN TWO YEARS TWO TO FIVE YEARS FIVE TO TEN YEARS TEN TO TWENTY YEARS MORE THAN TWENTY YEARS NATIVE DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 40. And, how long have you been a homeowner? (IF MORE OWNED MORE THAN ONE HOUSE, ASK FOR TOTAL LENGTH OF HOMEOWNERSHIP) (DO NOT READ CHOICES) LESS THAN TWO YEARS TWO TO FIVE YEARS FIVE TO TEN YEARS TEN TO TWENTY YEARS MORE THAN TWENTY YEARS DON'T KNOW (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 41. What is your main racial or ethnic origin? Is it ... (READ CHOICES - ACCEPT ONLY ONE RESPONSE) WHITE BLACK OR AFRICAN AMERICAN ASIAN ... or ... HISPANIC SOMETHING ELSE (Specify: ___________) (DO NOT READ) REFUSED (DO NOT READ) ---------------------------------------------------------------------------------------------------------------- 42. Gender (BY OBSERVATION) MALE FEMALE

At all times relevant to this matter, the name of Brewer's law firm was Bickel & Brewer. That firm is now known as Brewer, Attorneys & Counselors.

The survey questionnaire, modified for purposes of this opinion to omit the answers compiled, is attached to this opinion, in toto , as Appendix A.

Subsequent testimony established that both parties and witnesses had been contacted by the survey pollsters.

Specifically, the trial court's order awarded the following:
To Lennox Hearth Products, LLC:
• Attorney's Fees: $29,500.00
• Expenses: $3,500.00
• Contingent Attorney's Fees-Court of Appeals: $5,000.00
• Contingent Attorney's Fees (Oral Argument)-Court of Appeals: $2,800.00
• Contingent Expenses-Court of Appeals: $1,000.00
• Contingent Attorney's Fees-Supreme Court: $5,000.00
• Contingent Attorney's Fees (Oral Argument)-Supreme Court: $2,500.00
• Contingent Expenses-Supreme Court: $1,000.00
To Turner & Witt Plumbing:
• Attorney's Fees: $11,032.00
• Expenses: $1,919.76
• Contingent Attorney's Fees-Court of Appeals: $1,400.00
• Contingent Attorney's Fees (Oral Argument)-Court of Appeals: $1,120.00
• Contingent Attorney's Fees-Supreme Court: $2,800.00
• Contingent Attorney's Fees (Oral Argument)-Supreme Court: $1,120.00
• Contingent Expenses-Supreme Court: $750.00
To Strong Custom Builders, LLC:
• Attorney's Fees: $8,170.00
• Expenses: $554.83
• Contingent Attorney's Fees-Court of Appeals: $2,000.00
• Contingent Attorney's Fees (Oral Argument)-Court of Appeals: $1,000.00
To Thermo Dynamic Insulation, LLC:
• Attorney's Fees: $16,038.00
• Expenses: $3,738.68
• Contingent Attorney's Fees-Court of Appeals: $4,125.00
• Contingent Attorney's Fees (Oral Argument)-Court of Appeals: $2,475.00
To State Farm Lloyds Insurance Company:
• Attorney's Fees: $27,312.00
• Contingent Attorney's Fees-Court of Appeals: $2,500.00
• Contingent Attorney's Fees (Oral Argument)-Court of Appeals: $2,500.00
To Ken Teel, Becky Teel, Ross Rushing, and Meg Rushing:
• Attorney's Fees: $31,650.00
• Contingent Attorney's Fees-Court of Appeals: $2,500.00
• Contingent Attorney's Fees (Oral Argument)-Court of Appeals: $2,000.00

A "push poll" is a survey "done in the guise of information gathering, but truthfully done to try to sway or persuade, to effect attitude change."

See Judge David Hittner & Eric J. R. Nichols, Jury Selection in Federal Civil Litigation: General Procedures, New Rules, and the arrival of Batson , 23 Tex. Tech L. Rev . 407, 437-38 (1992) stating:
Many litigants are attempting to graft social science methods onto jury selection. The most celebrated of these methods is the community attitudinal survey. A jury consultant, ordinarily a psychologist, will prepare questions designed to elicit attitudes about the litigants or issues involved in a case and to ascertain the background characteristics of those polled. A market research team then conducts, in person or by telephone, a survey of large numbers of residents within the court's jurisdiction. Such surveys can then be used to develop a "psychographic profile" of the most and least attractive jurors. A litigant can also use the survey to gauge the receptiveness of a community to certain themes that a litigant might emphasize at trial.

Testimony established that the parties conducting the telephone survey had contacted "parties and attorney-represented, as well as unrepresented, witnesses involved with the pending litigation" and that a review of the database being used reflected that it included the trial judges' family and staff. Furthermore, a Lubbock Assistant City Attorney also testified that his review of the database led him to conclude that city employees and officials associated with the pending litigation were being targeted.

For example, one of the factual representations made during the survey was, "I am going to read you several statements about why the manufacturer of the corrugated stainless-steel tubing ... should not be held responsible." That statement was then followed by several factual recitations and a general question concerning "how convincing" that statement sounded to the party being interviewed.

See Footnote 4, supra.

Appellees dispute Brewer's assertion that he filed a motion for continuance. They base that argument on the fact that the written motion for continuance was filed on behalf of the law firm of Bickel & Brewer and not Brewer, individually. We give no weight to Appellees' argument.